## Richmond.

MARSHALL v. F. & M. SAVINGS BANK OF ALEXANDRIA AND ALS.

January 24th, 1889.

1. BANK DIRECTORS—*Duties and Liabilities.*—These officers hold to stockholders, depositors and creditors the relation of trustees to *cestuis que trust*, and as such are personally responsible for frauds and losses resulting from gross negligence and inattention to their trust duties.
2. IDEM—*Case at Bar.*—Record in this case discloses such gross negligence on the part of certain bank directors, whereby losses resulted, that it was *held*, that the directors were liable for losses resulting to the depositors, though they were not guilty of bad faith and were ignorant of the affairs of the bank.

Appeal from decree of circuit court of Alexandria city rendered March 30th, 1887, in the suit wherein James A. Marshall was complainant and the Farmers' and Mechanics' Savings Bank of Alexandria, Virginia, Andrew Jameison, John W. Stewart, and others were defendants. The object of the suit was to hold the directors of the bank personally responsible for losses resulting from their gross negligence to depositors. The circuit court dismissed the bill, and the complainant appealed. Opinion states the case.

*Francis L. Smith,* for appellant.

*S. F. Beach, Charles E. Stuart, George A. Mushbach,* and *J. M. Johnson,* for appellees.

LACY, J., delivered the opinion of the court.

This suit was brought by the appellant, James A. Marshall, for himself and on behalf of the other creditors of the appellee corporation, the Farmers' and Mechanics' Savings Bank of Virginia, a broken bank, to reduce into possession and distribute among said creditors the assets of the said bank, and to charge the individual defendants, who were the officers and directors of said bank, with the difference between the assets and liabilities of the said bank, upon the ground that the said directors had not had a meeting for at least one year prior to the 1st day of December, 1876, the date of the suspension and failure of the said bank, and for at least one year prior to the ascertainment of the embarrassed condition of said bank, which occurred some time before its said suspension, and that they did not give that care, supervision, and attention to the business affairs of said corporation which the duties of the office and the nature of the trust reposed in them required; but, on the contrary, neglected the same, and intrusted entirely the business concerns of the bank to the president and one, and possibly two, directors, who recklessly and improvidently loaned the money and securities of the said defendant corporation to various embarrassed and insolvent corporations, firms, and individuals, without taking proper and sufficient security for the protection of the depositors and creditors of the said bank, and being themselves connected with or interested in said embarrassed and insolvent corporations; by reason of which said conduct upon the part of said directors the appellant insists that heavy losses have fallen upon the bank, and that the said directors are individually and personally liable to the depositors and creditors of the said bank for the losses so occasioned by the neglect of the duties of their office as directors. The bank answered the bill of the plaintiff through its president, and the directors answered individually, wherein negligence is denied; and it is also denied that the business of the bank was intrusted wholly to the president; but

it is admitted that, "instead of regular formal weekly meetings of the board as prescribed by the by-laws of the bank, informal meetings were substituted, it being proven soon after the bank went into operation that formal weekly meetings were unnecessary."

The questions involved were referred to a commissioner in chancery for examination and report. The commissioner reported that the said directors not only did not exercise ordinary care and diligence, but that they were guilty of gross negligence. *First*, That the board of directors only met in 1873 three times; in 1874 twice; in 1875 once; in 1876 twelve times; in 1877 five times; in 1878 once. *Secondly*. That from the organization of the bank down to its suspension, December 1, 1876, there never was an examination made by the board of directors, or by any committee appointed by them, of the books, papers, funds, stocks, or bonds of the bank, or statement called for from other banks of the account of the said the Farmers' and Mechanics' Savings Bank with them. *Thirdly*. That, notwithstanding the fact that a committee was twice appointed for the purpose, an examination was never made of the books, and no report ever made or called for from the committees appointed. *Fourthly*. That the president, without authority, took from the cash drawer, from time to time, sums of money aggregating $2,187.33, leaving nothing but tickets for the said sums of money; that in 1874 the said president caused McKim & Co., of the city of Baltimore, to sell the coupon bonds issued by the said the Farmers' and Mechanics' Savings Bank, and deposited with the said McKim & Co., and appropriated the proceeds to his own private use, and never made any entry on the books of the bank prior to September, 1876, overdrew his account $341.64, and in other ways converted to his own use the property of the bank—said several sums aggregating $11,713.97 ; that the directors negligently failed to look at the books, into the cash drawer, or exercise any care whatever to discover these things, and when at last the facts did come to their knowledge they did

not remove, but continued this president, and allowed him to manage the books of the bank almost alone. *Fifth.* The account of the Alexandria Passenger railway company, which had this same president of the bank for its president for a time, and a director of this bank for its president afterwards, and whose treasurer was the cashier of this bank, was overdrawn $11,341.91, which was decreased, crediting notes aggregating $6,500, which were neither paid nor renewed, and the overdraft continued to increase until the suspension of the bank, which was at that time $7,530.45, but was manipulated so as to make it appear to be only $674.53. *Sixth.* That one P. B. Stilson borrowed $2,000 by depositing the notes of one J. A. Clark for $4,000 secured by a deed of trust in Maryland, and also the notes of one B. G. Daniels. The Clark note was perfectly good, and in November, 1873, Stilson was allowed to withdraw it and only leave the Daniel notes, which were perfectly worthless. *Seventh.* That the Washington & Ohio railroad company, whose president was for some years one of the directors of this bank, was loaned on May 8, 1872, $5,000, without a meeting of the board, and when the whole balance on hand was $9,373.98; July 5, 1873, $3,000 were lent, when only $6,396.71 were on hand; and on July 17, 1872, $5,000 were lent, when only $3,238.49 were the balance on hand. That nothing was ever paid on these notes until the appointment of a receiver. There were numerous other notes, aggregating large sums, for the security of which the bank held second mortgage bonds of the road, which proved to be worthless. The commissioner says that from the testimony it may be possible to class the original transaction of making the loan to this company as an error of judgment, but it was more than an error of judgment to sit idly by when the said company did not have the means to pay its renewals, nor take the trouble to renew the notes when they became due, and make an effort to collect the debt, or to require additional security; especially when the testimony discloses that nearly every one else who had loaned money to the road

680   MARSHALL *v.* F. & M. SAVINGS BANK OF ALEXANDRIA AND ALS.

Opinion.

was demanding and receiving additional security, and that the said the Farmers' and Mechanics' Savings Bank was almost the only holder of the notes of the said company, and that the dividends on the collaterals were not sufficient to pay the notes. The evidence shows that the bonds of the company were sold to pay interest, and that the published statements of the condition of the company disclosed the fact that the earnings of the company were not sufficient to pay the operating expenses and interest on the debt. *Eighth.* That Jameison & Collins owed the bank at suspension $3,311.62, for which there were no security, and no indorser except one of the makers, and that a new note was discounted for them amounting to $1,211.62, a few months before the suspension of the bank, to-wit, on the 30th of August, 1876; this Jameison being the brother of the president. *Ninth.* Robert Jameison, himself not solvent, and the brother of the president, with indorsers, both worth'ess, was loaned thousands of dollars, and at the suspension owed $2,300, some of his paper being altogether without an indorser; and the books of the bank showed that a note of Jameison's for $500, deposited for collection by W. F. Vincent, was protested November 8, 1873; and he reports the names of the directors, and their several periods of service. The capital stock of this bank was only $10,000, and of that only $6,200 were paid at the time of the suspension of the bank. The bank closed its doors and ceased to do business December 1, 1876. An assignment of assets was made September 18, 1877. A receiver was appointed May, 1878. The commissioner classifies the directors and their periods of service, and ascertains the amount for which the several classes are in his judgment liable. He ascertained that Robert Bell, Jr., Emanuel Francis, William Cogan, Andrew Jameison, and the estate of John W. Stewart are severally liable for principal and interest to March 15, 1886, $38,574.32; that said Robert Bell, Jr., Emanuel Francis, William Cogan, Andrew Jameison, and John W. Stewart were directors of the bank from its organization to the appointment of a receiver;

that Lewis Stein's, John P. Agnew's and John C. Graham's estate are severally liable for the amount of $35,917.09; the said Lewis Stein, John P. Agnew, and John C. Graham having been directors from May 13, 1873, to the appointment of a receiver; that Lewis McKenzie's and Jefferson Tacey's estate are severally liable for $21,682.71.

This report was excepted to, first, to the amount of principal ascertained by the commissioner to be due to the depositors, and allowing six per centum interest thereon; second, to the amounts ascertained by the commissioner to be due from the several debtors of the defendant bank, and also to the amount of the overdraft of the Alexandria Passenger railway company; third, to the special commissioner's finding the facts proved; fourth, to the conclusions of the said report by which they are held responsible for the several sums reported as respectively chargeable to them on account of alleged negligence, and of improper conduct in the discharge of their duties as directors; the evidence taken in the cause being wholly insufficient, as these defendants allege, to show any negligence or improper conduct which show either of said defendants so liable.

On the 30th of March, 1887, the circuit court of Alexandria city rendered a decree in the cause, whereby "the said report, so far as it finds the directors of the Farmers' and Mechanics' Savings Bank, or any of them, personally responsible for the losses sustained by the bank, be, and the same is, overruled—it appearing to the court that no such dereliction of duty on their part is shown as to fix upon them such personal liability; and that as to the said directors, and the personal representatives of such as are dead, the plaintiff's bill be, and the same is hereby, dismissed, with costs. It is further adjudged, ordered, and decreed that the said report be, and the same is hereby, confirmed and ratified in all other particulars." From this decree the plaintiff applied for and obtained an appeal to this court.

By the appellees no error is assigned, so the question involved here does not raise any other question than the single inquiry,

was there such negligence on the part of the directors of this bank as to make them, or any of them, personally liable for its losses? There is no dispute as to what the losses have been, and their several amounts; and of the terms or periods as to which each director is liable, if at all. The appellees insist, through their learned counsel, that while there have been errors of judgment and unfortunate loans made, there has been no negligence. The liability of directors for losses growing out of their mismanagement of the concerns of the bank, and their negligence in the discharge of their duties, has been often the subject of judicial investigation and decision. It is a question at this day well understood by the profession, and is not controverted to any degree by the learned counsel in this case. We find the settled rule upon this subject well stated in a recent work of great practical usefulness. The American and English Encyclopædia of Law, under the head "Banks," speaking of directors, says: " The directors of a bank have the general control and government of its affairs, and constitute the corporation. They are bound to exercise ordinary skill and diligence, and are liable for losses resulting from mismanagement of the affairs and business of the bank." Citing *Society* v. *Underwood,* 9 Bush, 609, which appears to have been criticised in *Zinn* v. *Mendel,* 9 W. Va. 580–597, and by Mr. Redfield in 13 Amer. Law Reg. (N. S.) 218; *Dunn* v. *Kyle,* 14 Bush, 134; *Brincker-hoff* v. *Bostwick,* 88 N. Y. 52; *Chester* v. *Halliard,* 34 N. J. Eq. 341; *Spering's Appeal,* 71 Pa. St. 11. There it is further said: " But for excusable mistakes concerning the law, and for errors of judgment when acting in good faith, they are not liable." Citing *Spering's Appeal, supra; Dunn* v. *Kyle, supra; Godbold* v. *Bank,* 11 Ala. 191; *Hodges* v. *Screw Co.,* 1 R. I. 312. See 2 Amer. & Eng. Cyclop. Law, 114, 116. Morse, in his work on Banks and Banking, says: " If bank directors do not manage the affairs and business of the bank according to the directions of the charter, and in good faith, they will be liable to make good all losses which their misconduct may inflict upon either

stockholders or creditors, or both. *Hodges* v. *Screw Co., supra.* They may be held to account to an injured party in a court of chancery (*Bank* v. *St. Johns*, 25 Ala. 566), or they, or any one of their number who shared in the wrongdoing, may be sued at law for damages. *Conant* v. *Bank*, 1 Ohio St. 298. * * * They are required simply to show a reasonable capacity for the position they accept; to use in it their best discretion and industry; to show the scrupulous *bona fides* and conscientiousness in every matter, however minute, which is exacted rigorously from all trustees of the property of others; and to obey accurately the requisitions of the charter, or of the general law under which they are organized." Morse, Banks, 133.

Mistakes as to what is the law serve to excuse cases where correct knowledge could be reasonably expected only from a professional man, and even in such cases, if the directors feel any doubts, they may be guilty of neglect if they fail to seek and be guided by competent legal advice. But ignorance of any fact in the bank's affairs, which it is their duty to know, can never be set up by them in defence or exculpation for any act which the existence of that fact should have prohibited. Id. 135. The high degree of confidence and responsibility resting upon directors of corporations has often led the courts to regard them as trustees, and to declare the relationship existing between them and the stockholders to be that of trustees and *cestuis que trust*, respectively. If this can be asserted with regard to the generality of corporations, it is peculiarly and exceptionally true with regard to banking corporations. The directors of a bank are not trustees for the stockholders alone, but they owe an even earlier duty to the depositors. The law is, as it ought to be, very jealous in exacting the strict and thorough performance of these duties, and it is in the scrutiny of possible breaches of them that the rigid rules which govern trustees have been applied. It is not enough to exculpate a director that no actual dishonesty can be shown; that he cannot be positively proved to have been influenced by interested motives. Id. pp. 113, 114.

Mr. Morawetz, in his work on Private Corporations, says as to the degree of care to be exercised (section 552): "Attempts have been made to define the degree of care and prudence which directors must exercise in the performance of their duties. In some of the cases it has been said that inasmuch as directors are usually not paid for their services, they are to be regarded as mandataries—persons who have gratuitously undertaken to perform certain duties, and are bound to exercise only ordinary care and prudence—and that they are liable to the corporation only for what is called *crassa negligentia,* or gross negligence. But all this is, at the best, misleading. The plain and obvious rule is that directors impliedly undertake to use as much diligence and care as the proper performance of the duties of their office requires. What constitutes a proper performance of the duties of a director is a question of fact, which must be determined in each case in view of all the circumstances, the character of the company, the condition of its business, the usual methods of managing such companies, and all other relevant facts must be taken into consideration. It is evident that no abstract reasoning can be of service in reaching a proper solution."

Directors, as trustees of a corporation, are bound to manage the affairs of the company with the same degree of care and prudence which is generally exercised by business men in the management of their own affairs. *Hun* v. *Cary,* 82 N. Y. 65; *Charitable Corporation* v. *Sutton,* 2 Atk. 405; *Litchfield* v. *White,* 3 Sandf. 545; *Hodges* v. *Screw Co., supra.* Directors are not merely bound to be honest; they must also be diligent and careful in performing the duties they have undertaken. They cannot excuse imprudence on the ground of their ignorance or inexperience, or the honesty of their intentions; and, if they commit an error of judgment through mere recklessness, or want of ordinary prudence and skill, the corporation may hold them responsible for the consequences. See the case of *Hun* v. *Cary,* 82 N. Y. 65; Earl, J., saying, in delivering the opinion

in that case: "One who voluntarily takes the position of director, and invites confidence in that relation, undertakes like a mandatary, with those whom he represents or for whom he acts, that he possesses at least ordinary knowledge and skill, and that he will bring them to bear in the discharge of his duties. Such is the rule applicable to public officers, to professional men, and to mechanics, and such is the rule which must be applicable to every person who undertakes to act for another in a situation or employment requiring skill and knowledge; and it matters not that the service is to be rendered gratuitously. These defendants voluntarily took the position of trustees of the bank. They invited depositors to confide to them their savings, and to intrust the safe-keeping and management of them to their skill and prudence. They undertook, not only that they would discharge their duties with proper care, but that they would exercise the ordinary skill and judgment requisite for the discharge of their delicate trust." Directors can never set up as a defense that they were ignorant of a provision of the company's charter or by-laws. See *Spering's Appeal, supra,* and the opinion of Chief Justice Greene in *Hodges* v. *Screw Co., supra.*

We cannot better close the discussion upon this question than by citing the case of *Bank* v. *Bossieux,* 4 Hughes, 398, 3 Fed. Rep. 817, much relied on by the learned counsel for the appellant, who says: "This question has been the subject of investigation and judicial determination by the United States circuit court for the Eastern district of Virginia. Judge Hughes, in an elaborate opinion, stating the law with great force and clearness, exhibiting a thorough and patient examination of all the authorities, held the defendant directors liable upon this ground: 'Gross inattention and negligence, allowing fraud or misconduct on the part of agents, officers, or co-directors which could have been prevented if they had given ordinary care and attention to their duties.' Indeed, this opinion is not only the most thorough examination, but the ablest exposition of the law upon the subject the writer has been able to find after examining

many authorities, and he might well be content to rest the law of this case upon the opinion of Judge Hughes. In it he reviews the case of *Spering's Appeal,* and shows that the very principle was declared in that case upon which he found the directors of the Dollar Savings Bank liable. He declares that 'negligence may be of such a character as to amount to fraud.'" Citing *Jones' Ex'rs* v. *Clark,* 25 Gratt. 655, and *Neal* v. *Clark,* 95 U. S. 707. In that case Judge Hughes says: "It will abundantly appear from authorities and reported cases to be cited in the sequel that the managing officers of corporations are personally liable for the results of gross negligence, or what the jurists call *crassa negligentia.* If by reckless inattention to the duties confided to them by their corporation, frauds and misconduct are perpetrated by officers, agents, and co-directors, which ordinary care on their part would have prevented, then I think it may be said with truth that it is now elementary law, to be found in all the books, that directors are personally liable for the losses resulting. Moreover, all authorities now tend to the conclusion that directors of banks and other moneyed corporations hold the relation to stockholders, depositors, and creditors of trustees to *cestuis que trust,* and as such are personally responsible for frauds and losses resulting from gross negligence and inattention to the duties of their trust." *Bank* v. *Bossieux,* 4 Hughes, 398; 3 Fed. Rep. 817, and the authorities cited in the opinion.

We will now proceed to briefly review the facts of this case to which this well established rule of law is to be applied. The question arises in this case as between the directors and the depositors, and not between the directors and the stockholders. The by-laws of this bank prescribed weekly meetings. It is conceded that these were scarcely ever held; the answers admitting that formal meetings were not held. The decree of the circuit court of Alexandria city, that it appears to the court that there has been no such dereliction of duty on the part of the directors, or any of them, as to fix upon them personal

responsibility, cannot be sustained upon any sound principle whatever. Upon what principle can Andrew Jameison be held not to be personally liable for the acts already detailed concerning him? The commissioner reports that he took $2,187.33 out of the cash drawer; that he withdrew without authority the bonds of the bank, deposited elsewhere, caused their sale, and appropriated the money to his own use; overdrew his account $341.64, and in other ways converted to his own use the property of the bank, aggregating $11,713.97. The passenger railway company was allowed to overdraw its account to the amount of thousands ($11,341.91) at one time. The notes of the company were discounted to the amount of $6,500, and at maturity neither protested, renewed, collected, nor sued on, and the overdraft was allowed to increase for a year and more without security, until it reached $7,530.45, which were entirely lost to the bank; he being the president of this company part of the time, and one of the bank directors being president of the company the other part of the time in question, while the treasurer of the railway company was the cashier of this savings bank. Stilson was allowed to withdraw the sole valuable security for his note of $2,000, and that was lost. He lent his brother $3,311.62 practically without any security, and that was lost; and actually lent him $1,211.62 a few months before the bank closed its doors; lending to Robert Jameison, with no security, except worthless indorsers, $2,300, when he had already gone to protest on a note of $500.

But the co-directors seek to escape responsibility for all this, including the large loss to the Washington & Ohio railroad, by claiming to have no actual knowledge of it at all. Did they exercise ordinary diligence to inform themselves, as their duty certainly required that they should? They were required to meet weekly by their own by-laws. They did not always meet semiannually—meeting sometimes once a year, as we have stated. They were in duty bound to cause the books of the bank to be examined at regular intervals. This they never did at all

throughout their whole career, nor did they ever call for a statement of their accounts with other banks. Their vaults and their cash-drawer were emptied by illegal abstractions and insolvent loans, and they admit that they never knew it, and pleaded this as their exculpation. The stock subscribed for was not paid up, as has been stated, and yet such part as was paid up was treated as a loan, and interest paid on it, and a large part had never been paid up at the time of the suspension, and some of it has not yet been paid up. Having a bank with so small a nominal capital, with empty vaults, and despoiled cash-drawer, they owed at the suspension of the bank, to depositors who had intrusted to them their money, $53,063.63, on which they have been able to pay ten per cent. If these directors had any duty to perform whatever towards their depositors, the records of this case do not show its performance. They plead ignorance. One of their number was the president of the Washington & Ohio railroad in its last hours, and knew its condition, and secured himself; but the notes due the bank were allowed to sleep unprotested, unsecured, unrenewed, uncollected, and unsued on. One of their number was the president of the Alexandria Passenger railroad company, and knew its condition. One of their number was the brother of their defaulting debtor, Jameison, who was insolvent at the time of the loan of thousands to him without security. It is difficult to concede that they could have been ignorant of all this. But suppose they were. Their duty required that they should have looked well into all these matters, and if they have negligently trusted them to others, and loss has occurred, should it fall on them, or upon the depositors who had trusted them, and whose trust they had accepted, and to whom they had solemnly promised such care and attention as were to be expected of good business men.

We think the record shows that these directors, and all of them, have been guilty of such negligence in the premises as makes them personally liable for the losses caused by their negligence, and we are of opinion that the circuit court of Alex-

andria city erred in holding them exonerated. While this is true, there is nothing in the record which shows any bad faith, or tends to show any dishonesty on the part of some of these gentlemen, who appear to have confided their duties to others and to have been betrayed by them; but this was such negligence as will fix liability upon them, and their act in assuming this attitude of trust and confidence was voluntary, and led to the confidence which has resulted in loss. We are of opinion to reverse the decree of the circuit court of Alexandria city appealed from, and to render such decree here as the said court ought to have rendered.

FAUNTLEROY, J., concurred in the opinion.

HINTON, J., concurred in the result.

LEWIS, P., and RICHARDSON, J., dissented.

DECREE REVERSED.