# CHARLESTON

ELLIOTT *et al. v.* FARMERS' BANK OF PHILIPPI *et al.*

Submitted June 15, 1906.   Decided April 17, 1907.

1. BANKS AND BANKING—*Insolvency—Priorities of Claims.*

In a suit by creditors, who are also directors and officers, of an insolvent banking corporation, to marshal and distribute the assets, and to charge the stockholders with their statutory liabilities to creditors for deficiency of assets, where it appears that the insolvency of the bank is due to the gross mismanagement and neglect of such directors and officers rendering them liable to creditors and stockholders for losses incurred thereby, they may, in a proper case, be postponed as creditors until the debts of all other creditors have been fully paid.   (p. 642.)

2. CORPORATIONS—*Officers—Liabilities.*

The relationship of officers and directors of a corporation and stockholders and creditors is that of trustees and *cestuis que trustent.* This is especially true with regard to banking corporations, where they owe an earlier duty to depositors; and if by their gross mismanagement and neglect loss is incurred, they will be rendered liable therefor to creditors and stockholders.   (p. 643.)

3. SAME.

Directors and officers of a banking corporation will not be relieved from such liability on account of ignorance or want of knowledge of those matters which it is their duty to know; and if they negligently entrust such matters to others, the loss incurred thereby should fall on them, and not upon their confiding depositors and stockholders.   (p. 643.)

4. SAME—*Stockholders—Liability—Action to Enforce—Set-off.*

In such a suit neither the bank nor its creditors or stockholders

are estopped from off-setting against the debts of other claimants or their assignees, whether by judgment or otherwise (no superior equities intervening), the indebtedness of such claimants to the bank not involved or adjudicated in a former suit between the same parties or their privies. (p. 648.)

Appeal from Circuit Court, Barbour County.

Action by Luther C. Elliott and others against the Farmers' Bank of Philippi and others. From a decree in favor of defendants, plaintiffs appeal.

*Affirmed.*

SAMUEL V. WOODS, for appellants.

MILLER, JUDGE:

The Farmers' Bank of Philippi was organized in December, 1875, with a capital stock, then or within a few days thereafter subscribed, of $29,000. April 2, 1886, it ceased to received deposits and went into liquidation. July 22, 1887, in the suit of Adam M. Woodford against the bank and others, the circuit court appointed a special receiver of its assets and property. Of the original directors elected at the organization, L. C. Elliott and Lewis Wilson continued in office up to the time of the appointment of the special receiver. J. N. B. Crim, one of the original directors, dropped out of the board about September 15, 1884, when he sold his seventy-five shares of stock to A. W. Woodford. He does not appear to have owned stock thereafter until March 10, 1886, when he and Isaac V. Johnson purchased at a trustee's sale forty-eight shares previously held by John W. Corder, Crim taking twenty-four shares and Johnson twenty-four. February 21, 1887, after the bank had gone into liquidation, Crim was again elected a director to fill the vacancy caused by the resignation of J. H. Glasscock, and continued in office until the appointment of the special receiver. With the exception of Crim, the officers and directors were then the same as on April 2, 1886—as follows: James E. Heatherly, president; John W. Bosworth, vice-president; George W. Gall, Jr., cashier; J. H. Glasscock, Luther C. Elliott, Lewis Walter, C. F. Teter, A. J. Gall, Lewis Wilson. James W. Talbott, an original stockholder, was cashier of the bank from the time of its organization until about six months prior to April 2, 1886, when he was succeeded by G. W. Gall, Jr. He was also

secretary of the Philippi M. & M. Co., and with C. R. Crislip, a director of that company, and J. H. Glasscock, a director of the bank, indorser of its paper, and to which company large credits were extended by the bank.

The record discloses that the business of this bank was greatly mismanaged, almost from the beginning. It appears that most of the money of the stockholders and depositors was either loaned to the directors, or corporations in which they were interested, upon insufficient or no security, the larger portion of which was entirely lost. After exhausting all the solvent assets and the double liability of the solvent stockholders, there remained at the date of the final decree a deficit of over $5,000 necessary to pay creditors. Although as early as September 5, 1881, the directors called for payment of unpaid subscriptions of stockholders, the resolution provided that if it did not suit the stockholders to pay they should in lieu thereof be permitted to put in their notes with approved security at six months. It does not appear what the unpaid subscriptions amounted to at the date of this resolution, but Commissioner Kittle in his first report, filed February, 1897, reports among the worthless assets of the bank, then aggregating $47,734.08, notes which we are able to identify with reasonable certainty as the notes of stockholders and their sureties or indorsers, given for unpaid subscriptions on stock aggregating over $22,000, and almost the entire amount of the remainder of these worthless assets is made up of notes of insolvent directors and stockholders of the Philippi M. & M. Co. · As was to have been expected, few of these debts were ever reduced to judgment by the directors, although some of them had been active in suing the bank and obtaining judgment for individual claims of their own, or assigning them to third persons—evidently to avoid, if possible, the payment of their stock liability on their worthless notes given in lieu thereof.

As apropos to the points presented for our consideration on this appeal, the following transactions of the directors are significant: January 23, 1886, a committee of the directors composed of J. H. Glasscock, L. C. Elliott and J. W. Bosworth, appointed at a meeting of January 4, 1886, reported the assets as follows—discounted paper $41,875.35, real estate $2,471.21, furniture and fixtures $989.17, current ex-

penses $1,096.88, due from banks or collectors $486.15, legal expenses $486.04, cash, checks and call loans $12,674.97; liabilities, capital stock $20,000, undivided profits $1,220.73, unpaid dividends $294, individual deposits $13,297.72, special deposits $7,689.37, exchange $208.09, profit and loss $29.67, rediscount and commercial paper $7,123.24, bank deposits $8,264.02; total resources and liabilities $60,079.77. Cashier Gall, examined with reference to this statement, makes the following significant admissions: that at the time of this statement the majority of the large stockholders were broken up and insolvent; that of the discounted paper the bank will lose at least $28,000; that included in the item $12,674.97 cash is a $7,300 deed of trust debt of the Philippi M. & M. Co.; that this $7,300 was assigned to him as trustee, and on it he realized about $2,100, which was applied on the so-called L. C. Elliott debt. Commissioner Kittle also reports that of the total assets of the bank only $14,347.84 is collectible, and that the indebtedness is $31,592.96. In the answer of John F. Woodford to the bill he charges that about April 1, 1886, after the organization of the Tygarts Valley Bank the officers of the Farmers Bank, without the knowledge or consent of the stockholders except themselves, conveyed the brick bank building to the new bank for a price unknown to him; and he charges that "they have appropriated the proceeds arising from said sale in some manner according to their own desires, and in derogation of the rights of the creditors of the bank to have the proceeds distributed among them upon their said several debts." The final decree reserves this question for further litigation.

January 4, 1886, the directors authorized the president to execute and negotiate two notes of $1,500 each, to be indorsed by them individually and secured by the judgment of the bank against J. M. Woodford for $1,496.48; a note of J. A. Williamson, October 3, 1885, at one hundred and twenty days, for $950; a note of J. M. Woodford, December 14, 1885, at one hundred and ten days, for $810; and a note of J. H. Woodford, August 10, 1884, at thirty days, for $500; all to be set aside by G. W. Gall, Jr., cashier, and held exclusively for this purpose.

February 1, 1886, the directors, after reciting the fact that on January 12, 1880, J. W. Talbott, cashier, had executed a bond

with J. F. Woodford, E. D. Talbott, J. E. Heatherly, A. G. Daniels, J. M. Woodford, Henry A. Gall and J. W. Robinson as sureties, who had become liable thereon and who the resolution recites had confessed judgment for some sum not stated, ordered that all liability should be released on account of said bond, "save and except as to two notes of the P. M. & M. Co., one for $1,400 and the other for $1,500, payable to the Farmers' Bank of Philippi, upon which the said Talbott, as cashier, without authority, indorsed the name of the bank as surety."

November 12, 1886, after having gone into liquidation, the directors met and "ordered that the cashier set aside and hold in trust a sufficient amount of the notes and judgments due to and belonging to this bank to secure, indemnify and save harmless the directors who have heretofore executed their individual notes, to-wit: one note to James Corder for $3,000, one note to Nancy C. Modisett for $1,928.06, one note to J. C. Woodford for $2,000, and one note to E. W. Post for $1,350; and to hypothecate a sufficient amount thereof, if possible, upon proper terms, and pay and discharge the above named notes."

December 22, 1886, the directors, all present, after reciting the execution of the foregoing notes, and also a note of $1,400 to the Tygarts Valley Bank, ordered that J. E. Heatherly, president, "do for and on behalf of this bank, and under its common seal, transfer and assign to G. W. Gall, Jr., as trustee, a sufficient amount of the debts on said bank, whether existing in the form of notes or judgments, to secure and satisfy to said directors the full sum or sums for which they so executed their notes or obligations as aforesaid, said notes and judgments or accounts to be collected by said G. W. Gall, Jr., trustee, and applied by him in payment to said Heatherly, Glasscock, Walter, Bosworth, Teter, Elliott, A. J. Gall and G. W. Gall, Jr., the amount assumed or paid by them to said Corder, Modisett, Woodford, Post and the Tygarts Valley Bank."

July 22, 1887, the special receiver was appointed in the suit of A. M. Woodford against the Farmers' Bank of Philippi and others. Woodford was then a stockholder, holding forty shares of stock, but insolvent, and was also indorser on the stock note of J. W. Corder, amounting, May 22, 1896, to $3,120.39.

In April, 1891, the date of the institution of this suit, the only stockholders then solvent, and who were such stockholders when the bank became indebted, were J. N. B. Crim, James E. Hall, John T. Woodford, John W. Bosworth, George W. Gall, Jr., Andrew J. Gall, Lewis Walter, Luther C. Elliott, William J. Elliott, James Knotts, Thomas P. R. Brown and Charles F. Teter. Commissioner Kittle in his first report, filed in February, 1897, reported as solvent stockholders, and liable for debts when contracted, J. N. B. Crim, 75 shares; James E. Hall, 5 shares; B. M. Gall, 10 shares; John F. Woodford, 13 shares; C. C. Hovatter, 1 share; E. D. Talbott, 5 shares; I. H. Strickler, 20 shares, total, 129 shares. In the commissioner's second report, filed in October, 1899, he reports as solvent when the debts were contracted the same stockholders as in his first report, and that the solvent stockholders then (October, 1899,) were as follows: J. N. B. Crim, 24 shares; John W. Bosworth, 6 shares; William F. Elliott, 2 shares; Luther C. Elliott, 7 shares; A. J. Gall, 10 shares; James Knotts, 5 shares; James Wilson, 3 shares; Lewis Walter, 2 shares; C. F. Gates, 1 share; I. V. Johnson, 24 shares; total, 97 shares. This suit was commenced by Luther C. Elliott and George W. Gall, Jr., cashier, both directors and stockholders, claiming also to be creditors, and Samuel V. Woods, Isaac Lance and Marion Lance, administrators, suing on behalf of themselves and of all other creditors of the Farmers' Bank of Philippi who would come in and contribute to the costs, against the Farmers' Bank of Philippi, Melville Peck, special receiver, J. N. B. Crim and other stockholders and creditors of the defendant bank.

It was charged in the bill that judgments had been recovered against the bank, and that executions thereon had been returned "no property found," as follows: Exchange Bank of Wheeling, judgment against the Farmers' Bank of Philippi, the Philippi Manufacturing & Mercantile Company, James W. Talbott, J. H. Glasscock and Gibson R. Crislip, November 1, 1887, for $1,154.33; Anthony Hoffman, judgment against the bank May 22, 1888, for $330.20; Isaac and Marion Lance, administrators, judgment July 7, 1887, for $215.29; Samuel V. Woods, judgment December 6, 1888, for $269.92; Chester W. Proudfoot, use of Samuel V. Woods,

judgment December 31, 1889, for $373.48; Bank of Wheeling, judgment March 10, 1888, for $125.08; Luther C. Elliott, judgment March 12, 1888, for $7,076.02, made up of three sums of $4,928.06, $2,000 and $1,350; Ella M. Surghnor, judgment October 5, 1885, for $130; George Poling, judgment December 31, 1885, for $44; Rachel Poling, judgment December 31, 1885, for $44; First National Bank, judgment for $112; Josiah Murphy, judgment for $400; and Enoch G. Hoffman, judgment, assigned to George W. Gall, Jr., for $74; that by virtue of section 78, chapter 54, Code, the several stockholders owning stock when said indebtedness accrued to the plaintiffs were and are liable to them as creditors of the bank, to an amount equal to the stock held by them, over and above the amount of their respective stock-holdings; and the prayer of the bill is that if it be necessary to satisfy the several debts of the plaintiffs the said stockholders may be compelled to contribute ratably an amount equal to the amount of the capital stock held by them respectively, at the dates when said several debts were contracted, to be distributed according to the respective rights of the plaintiffs, and for general relief. The defendants William W. Daniels, George W. Diddle, J. H. Woods and A. T. Daniels filed a joint petition, and T. T. Elliott, Lewis Wilson and J. J. Nicholson & Sons, claiming to be creditors, also filed petitions to be made parties plaintiff, and all joined in the prayer of the bill.

November 12, 1891, the cause was referred to a commissioner, who dying before executing the order, Commissioner Kittle was substituted, who filed his first report February 22, 1897, to which there were exceptions by John F. Woodford, J. N. B. Crim, I. V. Johnson, J. J. Nicholson & Sons, A. G. Daniels, J. H. Diddle, J. Hop Woods, W. W. Daniels, I. H. Strickler's administrators, C. W. Proudfoot, George W. Diddle, L. C. Elliott and E. D. Talbott. The most important of these exceptions related to the allowance of debts claimed by L. C. Elliott and other officers of the bank alleged to be responsible for the disastrous conduct of its business.

June 3, 1897, the defendant J. N. B. Crim filed an answer to the bill, with prayer for special relief, in which among other defenses he alleges that he was induced to purchase

twenty-four shares of the J. W. Corder stock by the false and fraudulent representations of the plaintiffs L. C. Elliott and George W. Gall, Jr.; that said stock was fully paid up, and by their false statement of the condition of the business, January 23, 1886, and that the said stock was worth dollar for dollar, when prior thereto, as appeared, these directors, in order to keep going, had borrowed money on their individual notes, which had been placed to the credit of L. C. Elliott, and for which they had pledged the assets of the bank to themselves as security, well knowing that the bank was insolvent and that at least $28,000 of the discounted paper reported consisted of worthless notes of persons who had broken up, and some of whom had left the country; and the answer prayed that these directors might be required to refund all moneys received by them, that the debts claimed by Elliott, Wilson and other directors be not allowed or paid out of the assets of the bank, or postponed until all other debts and liabilities are paid in full, and that the stockholders should not be made liable therefor. It is also charged that the directors wrongfully suffered judgments to be recovered against the bank by Nicholson & Sons, and by the Tygarts Valley Bank, upon paper upon which the bank was not legally liable for want of authority to execute the same, and for want of proper protest thereof; and other defenses not necessary to be referred to were also interposed. John F. Woodford and I. V. Johnson also filed answers, which set up equities against the debts claimed by the directors Elliott and others. It is also charged in the answer of Woodford that there is included in the Elliott judgment $1,486.96 paid by G. W. Gall, Jr., which should be off-set by Gall's indebtedness to the bank; and that another part of this judgment belonged to J. E. Heatherly, which should be off-set by his indebtedness to the bank. It charges also that the banking house was sold to the Tygarts Valley Bank and the proceeds thereof distributed according to the will of the directors, and in derogation of the rights of the creditors of the bank. Johnson in his answer makes substantially the same defenses as those made by Crim in his answer. It is assigned as error that no process was issued on these answers. While they prayed for relief, yet in fact they were mainly defensive, and no process was required against the original plaintiffs and

those who came in by petition and made themselves plaintiffs.

Many of the exceptions to the commissioner's report were sustained; others were overruled by the decree entered March 2, 1899, recommitting the cause to Commissioner Kittle. By this decree it was ordered that the debts reported in favor of I. V. Johnson for $290.57, L. C. Elliott for $6,463.51, Lewis Wilson for $2,017.22, and Charles F. Teter for $290.33, should be postponed in point of payment out of the assets of the bank until the valid debts of all other creditors not officers thereof should be paid in full, the court being of opinion that said officers were only entitled to payment out of the assets after all other valid creditors were satisfied; and as to the question whether they were entitled to be paid in any event out of the statutory liabilities of stockholders, the court reserved its judgment. The court also decreed that the debt of $515.51 reported in favor of Samuel V. Woods, assignee of Chester W. Proudfoot, should not be paid out of the assets of the said bank, or the liabilities of stockholders which might thereafter be fixed, the court being of opinion that said debt should be off-set by the liability of Proudfoot to the bank upon three notes of $382, $906 and $140 respectively, due from him to the bank for unpaid purchase money upon sixteen shares of stock. And the court, proceeding to fix the rule by which the commissioner should be guided for further report, adjudged as follows: that the said commissioner should first ascertain the whole amount of the par value of the solvent stock held by the several stockholders; second, the deficit to be paid to the creditors of the bank who were not officers thereof, after exhausting all its assets; third, the deficit which remained to be paid to all the creditors of the bank, including those who are such officers, after the application of all the assets of the bank; fourth, the amount to be paid by each solvent stockholder to satisfy the liability of creditors not officers of the bank, in the proportion which his stock bore to the whole amount of the solvent capital stock; fifth, the amount to be paid by each solvent stockholder to satisfy the creditors of the bank, including those who were officers of the bank, upon the same basis; sixth, to assess the solvent stockholders with an amount equal, if necessary, to the amount of stock held by them, respec-

tively, to discharge the debts of the other creditors accruing while they were such stockholders; and, seventh, the commissioner was required to assess the solvent stockholders to an amount equal, if necessary, to the amount of stock held by them, to pay the debts accruing to creditors, other than officers, while they were such stockholders. This seems to have been substantially the basis of accounting adopted in *Hope* v. *Salt Co.*, 25 W. Va. 789.

In his second report Commissioner Kittle reported debts, other 'than those of the directors postponed, aggregating $20,836.10; solvent assets, including funds in the hands of the special receiver and balances due from stockholders on unpaid subscriptions, aggregating $14,347.84. These, the commissioner reported, would pay the creditors not officers 68.8 per cent. of their claims, as of October 30, 1899, leaving a balance due them of 31.2 per cent. Among the debts so reported were sundry debts of the Tygarts Valley Bank. At the request of the plaintiff's attorney, the commissioner also reported that if the debts due to the Tygarts Valley Bank, aggregating $1,347.65, should be eliminated the creditors would then receive out of the assets 73.56 per cent. of their respective claims, which would leave to be paid to them out of the statutory liabilities of the stockholders but 24.44 per cent., aggregating $5,157.12. There were numerous exceptions to this second report of the commissioner by John F. Woodford, L. C. Elliott, W. W. Daniels, J. N. B. Crim and I. V. Johnson.

In the decree appealed from of November 11, 1899, the court, as a basis for distribution of assets and liabilities of solvent stockholders, adopted the special report of the commissioner requested by plaintiff's counsel, thereby eliminating from the preferred creditors the debts of the Tygarts Valley Bank and placing them in the same class with those of the deferred directors. The court also confirmed the report disallowing to B. M. Gall, assignee of G. W. Gall, the debts of the Parkersburg Bank, E. G. Hoffman, Ella Surghnor, Martin G. Poling, Sarah Poling and Josiah Murphy, also disallowing the several judgments of A. T. Daniels for the use of J. Hop Woods, of A. T. Daniels for the use of W. W. Daniels, and other judgments. The decree also distributed the assets to the several preferred creditors, and

gave judgment in their favor for the balance due them against the solvent stockholders according to the special report of the commissioner. There was no exception by C. W. Proudfoot, or by his assignee Samuel V. Woods, to the second report of said commissioner, disallowing the judgment in his favor for the use of the said Woods, as reported by said commissioner in his said first report. The court further decreed that there was justly due from the defendant bank to the Tygarts Valley Bank six debts aggregating $1,347.65, to I. V. Johnson $329,13, to Charles F. Teter $334.75, to L. C. Elliott the balance upon his debt $7,797.15, and to Lewis Wilson $2,095.83, all of which had been postponed in point of payment out of the assets of the said bank; and the court also gave decrees in favor of said several deferred creditors, Johnson, Teter, Elliott and Wilson, against themselves and all other solvent stockholders, for the several sums apportioned against them by the commissioner, as applicable to said deferred debts, out of the balance of their statutory liabilities, leaving a deficit necessary to discharge the total indebtedness to said Elliott, as reported by said commissioner, of $5,300.40. The deficiency necessary to pay L. C. Elliott in full, as reported by the commissioner, was due to the fact that before reaching his claim some of the holders of stock at the time of the incurring of his debt had already been assessed the full amount and could not be further assessed therefor.

It will be borne in mind that the real object of this suit was to charge the stockholders with their statutory liabilities to creditors on account of the deficiency of assets, and that it was necessary, in order to determine the amount of this liability, to bring into this suit all the creditors and stockholders, to marshall the assets, distribute the same, and after this to charge the stockholders with the deficiency. This has involved a most complicated accounting between creditors and stockholders. The appellants waited nearly two years after the final decree, and evidently until after distribution had been made in accordance with the decree, before applying for this appeal. There has been no appearance in this Court, nor any briefs or arguments filed, on behalf of any of the appellees. Much labor has thereby been imposed upon

the Court in an effort to comprehend the mass of figures and details involved. In his brief the appellants' counsel expresses the hope that this Court will be able to discover upon what principles of equity the decree can stand which provided, for example, for the payment in full of the debts of the defendants Crim and Johnson, whom he claims stand in the shoes of J. W. Corder, an insolvent debtor of the bank, while denying to Proudfoot, Gall and Daniels payment of their debts and allowing the insolvent bank its debt of $1,365.47. It is not claimed, says counsel, that either Elliott or B. M. Gall, assignee of George W. Gall, Jr., or George W. Gall, Jr., individually, had any right to prefer themselves over other creditors, but it is claimed that they are all trustees and sustain the same fiduciary relations to the bank and its creditors, and that there should have been no discrimination among them as such. In the same connection, it is also insisted by counsel that Crim was also a director, and that his debt should on the same principle have been classed with the debts of other directors; and finally, in view of these and other errors relied on and to be noted hereafter, counsel requests the court to reverse the decree, or, if not possible to do so, and in order to avoid the confusion which a reversal would produce, the court is asked to modify, correct and affirm the decree by providing that in so far as other directors were preferred and paid over L. C. Elliott they be required and decreed to refund to him until his debt shall be paid ratably with other directors and officers of the bank.

In reference to the supposed discrimination in favor of director Crim, we do not think the point is well taken. While Crim was made a director in February, 1887, this was long after all the liabilities of the bank to Elliott and the other appellants had been incurred, and for which Crim was in no way responsible. Elliott and his co-directors had already suffered the bank to be wrecked, and while in this wrecked condition had made up and published a statement of the condition of the bank, reporting it to be solvent, by which and by other representations Crim and Johnson were induced to purchase the Corder stock, and thereby rendering themselves liable to account to creditors on this, and Crim on other stock held by him. To a certain extent Crim and Johnson stood in the shoes of Corder, whose stock they pur-

chased; yet the purchase money went to pay the balance due the bank on Corder's stock subscription. It is claimed for Elliott and others that he also was a bidder for the Corder stock, and that he really believed the bank was solvent and the stock valuable, but although a bidder he did not buy, but suffered the stock to go to Crim and Johnson at 33 per cent of its par value. For all we can see, his bidding may have been designed to mislead and deceive Crim and Johnson and involve them in the impending collapse of the bank. Besides, we find that as early as January 4, 1886, they began to pledge the securities of the bank for their individual indorsements of notes issued to raise money to keep the doors of the bank open; and that on February 1, 1886, they undertook to release the bond of their cashier Talbott, and some of their own number as his sureties, except as to two notes indorsed without authority and upon which Talbott and his sureties had confessed judgment. This cashier was then insolvent and largely indebted to the bank, and other facts appearing in the record point to gross mismanagement by him, and that he and his sureties should have been otherwise rendered liable to creditors and stockholders on his official bond. There was no other discrimination against Elliott; but his counsel claims that the decree fails to do what it ought to have done—that is, to provide for the payment ratably of all those persons who were directors and officers in the bank out of the remaining assets, after all other creditors had been paid in full; in other words, that Crim and others should have been inflicted with the penalty of postponement, when they had had no part in the mismanagement of the business of the bank. Another complaint of unjust discrimination against Elliott is that the court decreed payment·of $1,347.65 to the Tygarts Valley Bank, assignee of the Farmers' Bank of Philippi, thereby (as counsel claims) paying itself in preference to its creditor Elliott. This decree, as already indicated, was based on the special report of the commissioner made by request of Elliott's counsel. As we understand the facts in regard to this matter, Elliott and his creditors settled with J. W. Robinson by accepting from his three sons their notes to cover their father's indebtedness to the bank, and these notes were indorsed and assigned by the Farmers' Bank to the

Tygarts Valley Bank, and upon them the latter bank subsequently obtained judgment against the makers and indorsers. The record does not disclose what the Farmers' Bank realized from the sale of the Robinson notes, nor whether the Robinsons (the principal makers of the notes) were solvent or insolvent. We assume they were insolvent; if not, their notes, upon payment out of the assets of the bank or liabilities of stockholders, became their property. We do not perceive, therefore, upon what principles Elliott can claim the right to stand on the same basis as the Tygarts Valley Bank.

It is practically conceded that the debts of the directors were properly postponed, although the bill was framed on the theory of equality of all creditors in the distribution of assets and stock liabilities. Counsel refers us to *Richardson* v. *Green*, 133 U. S. 30; *Fitzgerald* v. *Fitzgerald*, 13 U. S. 98; Cook on Stocholders (3rd Ed.) 936, and *Hope* v. *Salt Co.*, 25 W. Va. 789, for the general doctrine that an officer, director or stockholder of a solvent going corporation is not precluded, because of his relationship to the corporation, from making loans of money and pledging the property of the corporation as security therefor, if done in good faith and to promote the interests of the company. These authorities, however, all hold that courts will view all such transactions with suspicion, and will not lend their aid to the enforcement of such contracts unless satisfied by proof that they were made in good faith and for the benefit of the corporation.

Another proposition applicable especially to officers and directors of moneyed corporations, supported by the best authority, is that such officers and directors hold the relation to stockholders, depositors and creditors of trustees to *cestuis que trustent*, and as such are personally liable for frauds and losses resulting from gross negligence and inattention to the duties of their trust. *Marshall* v. *Farmers Bank*, 85 Va. 676; 17 Am. St. Rep. 84; and notes; 1 Morse on Banks and Banking (4th Ed.) section 130.

The statute relating to the oath required of directors of banks then in force, the same as the present statute (Code, chapter 54, section 78 Iv.), requires that each director shall "take an oath that he will, so far as the duty devolves upon

him, diligently and honestly administer the affairs of the company, and that he will not knowingly and willingly permit to be violated any of the provisions of the laws of this state relating to banks." In 1 Morse on Banks and Banking, section 125, the author says, with reference to the duties of directors of banks: "They must carefully obey the law under which the bank is organized, must act with entire good faith, and, like all other agents, they contract for reasonable capacity; skill and care in the discharge of their duties." And in the same section he says that, if the relationship of directors to stockholders of corporations generally be that of trustees and *cestuis que trustent* respectively, it is peculiarly and exceptionally true with regard to banking corporations, in whose solvency the whole neighboring community must be at least indirectly interested. The directors of a bank, says he, "are not trustees for the stockholders alone, but they owe even an earlier duty to the depositors. * * * It is not enough to exculpate a director, that no actual dishonesty can be shown, that he can not be positively proved to have been influenced by interested motives. Like a trustee, he is absolutely prohibited from the performance of those questionable acts wherein his conduct may be wholly free from blame, but where the bias of self-interest is strong, and may influence him even without his own recognition of the fact. A director who wishes to keep completely within the protection of the law, must look to something more than the mere integrity of his own intentions. * * * The law, therefore, has, with wholesome care, declared that it is the duty of a director, resulting from the employment itself, not to acquire any interest in any matter adverse to that of the bank so long as he remains in office." And in section 717 this writer says: "The right to sue directors for malfeasance in office whereby loss occurs to stockholders is often expressly given to the stockholders by statutory enactment, though without doubt it exists at common law." In *Marshall* v. *Farmers' Bank*, *supra*, there is a lengthy discussion of the liability of directors of corporations to creditors and stockholders and the degree of care required, with an extended monographic note by the editor, Mr. Freeman, in which all the leading authorities are collated; and we can do no better than to refer the reader to this case

for a more extended discussion of the law pertaining to the subject.

While it is true that directors and officers are not precluded, on account of relationship to the corporation, from loaning money to and making contracts generally with the corporation, and enforcing the same; yet, when the corporation is insolvent, an entirely different question arises, and the weight of authority clearly holds that an insolvent corporation can not pay a debt due to a director in preference to debts due others, either by turning out property or cash to him, or by giving him mortgages on corporation assets. 2 Cook on Stock and Stockh. (3rd Ed.) section 661 p. 938. The case of *Marshall* v. *Bank*, *supra*, is particularly in point. The gross negligence and fraud charged against the directors in that case were of the same character as in this case. The Virginia court in that case, reversing the decree of the lower court, acquitting directors, and replying to the defense based on the alleged ignorance of the directors, says: "It is difficult to concede that they could have been ignorant of all this. But suppose they were, their duty required that they should have looked well into all these matters, and if they have negligently trusted them to others, and loss has occurred, should it fall on them, or upon the depositors, who had trusted them, and whose trust they had accepted, and to whom they had solemnly promised such care and attention as were to be expected of good business men?"

The court below, acting on the principles of these authorities, evidently concluded, and we think rightly, that there had been such gross negligence and inattention to the business of the bank on the part of the directors, before and after insolvency, in relinquishing rights, and in acquiring for themselves unjust advantages over other creditors, as to require that they should be postponed until the claims of all other creditors had been fully satisfied. The fact that the application of these principles has fallen most heavily upon the appellant Elliott is due to the fact that, after exhausting the assets of the bank and the statutory liabilities of stockholders, his claim, being the largest, could not be paid in full.

The debts of the other appellants stand on a somewhat different footing. The directors in each case suffered judgment to go

against the bank in their favor, when the original claimants
were indebted to the bank beyond the claims sued for—
some of them for unpaid subscriptions on stock. These ap-
pellants now claim that they were entitled to have had these
counter-claims or off-sets presented at the trial of their ac-
tions at law, and that the bank is now estopped. It may be
sufficient to reply, that by its decree of March 2, 1899, the
court below, upon their several exceptions to the report of
commissioner Kittle, adjudicated and finally disallowed their
several claims. From this decree there has been no appeal;
and there could have been no appeal therefrom when the
present petition was presented in July, 1901, as more than
two years had then elapsed from the date of that decree. That
was an appealable decree, although the cause was thereby re-
committed to the commissioner to carry out the principles.
*Kohle* .v. *Oil Co.*, 51 W. Va. 310, 314. The same rule ob-
tains in Virginia. *Garrett* v. *Bradford*, 26 Grat. 609. But
if the rights of these appellants were still open for our con-
sideration, we do not think that either the bank or its stock-
holders were estopped. They were not parties to those suits.
The bank was misrepresented by negligent directors, who
suffered those judgments to go by default, in fraud of the
rights of the bank and its stockholders. No superior equities
are set up by these judgment creditors. So far as the record
shows, they stand strictly in the shoes of their assignors.
The claim of the bank against the assignors for stock sub-
scriptions and other liabilities was not necessarily involved in
those suits; the claim of the bank constituted separate and
distinct causes of action, and the mere fact that these counter-
claims might have been used to defeat recovery of those
judgments, but were not, is not conclusive of the rights of
the parties to this suit. *Dent* v. *Pickens*, 50 W. Va. 382,
386; 2 Black on Judg. section 761. The author last cited
says: "While it is true that a defendant is bound to bring
forward and establish any defense to the plaintiff's cause of
action which he may have, or be barred of urging it in any
subsequent litigation, this does not always hold good with re-
spect to an independent claim against the plaintiff, or which,
though connected with the same transaction, is of such a
nature that it could be made the basis of a separate suit, or
would authorize affirmative relief to the defendant; in fact,

as a general rule, when the defendant has a claim which he might use as a set-off or counter-claim he is at liberty to set it up in the first suit or not, as he may choose; and if he does not use it in that action, he is not precluded from afterwards maintaining a separate action upon it against the plaintiff." And where the judgment creditor is insolvent, equity will interfere, if necessary by injunction, to let in off-sets. Hogg's. Eq. Pr., section 277, citing *Jarrett* v. *Goodnow*, 39 W. Va. 602; *Farland* v. *Ward*, 35 W. Va. 458. A party is not obliged to plead a set-off. He may do so or not, as he prefers. If he does not do so, the judgment or decree does not affect it. *Kennedy* v. *Davidson*, 46 W. Va. 433.

As we cannot see that any injustice has been done the appellants, or that any rules of law or principles of equity have been violated, we affirm the decree of the circuit court.

            *Affirmed.*