# CHARLESTON.

BENEDUM *v.* FIRST CITIZENS BANK *et als.*

Submitted March 12, 1912.   Decided February 25, 1913.

1. BANKS AND BANKING—*Insolvency—Receivership—Effect.*
   The appointment of a receiver in a creditor's suit, brought to wind up the business of an insolvent bank and distribute its assets. does not preclude creditors other than the plaintiff in the bill from setting up in the same suit, by cross-bill, grounds of relief against the plaintiff, the officers, stockholders and other creditors, not set forth or admitted in the bill.   (p. 128).

2. SAME—*Insolvency—Assets.*
   In such case, the assets of the bank, including rights of action against its officers and stockholders for losses occasioned by their misconduct and misappropriation of funds, constitute a trust fund for the benefit of creditors and they may come in, not only to share in the distribution thereof, but also to require collection of the assets.   (p. 128).

3. SAME.
   If, in such case, grounds of relief against officers and stockholders have been omitted from the bill and the receiver has not instituted any suit or other proceeding to enforce such claims, cross-bills by creditors, not seeking to withdraw such assets from the suit, nor to interfere with the custody or possession of the receiver, may be filed.   (p. 130).

4. SAME—*Insolvency—Assets—Right of Action—Offset.*
   An officer of an insolvent bank, held liable in such a suit for all of his indebtedness to the bank and losses occasioned by his misconduct or neglect of duty, required to restore all of his misappropriations and deprived of the benefit of all preferences he has obtained. so far as claims against him on such accounts are passed upon in the decree, cannot properly be denied participation in the distribution of the assets on account of his deposits and other claims against the bank.  In such case,

72  W. Va.

his entire liability should be ascertained and decreed against him and then he should be allowed to participte in the distribution, on payment or collection of a sufficient amount to insure ratable distribution among all creditors including himself.    (p. 131).

5.    SAME.

A creditor of an insolvent bank, though an officer and held liable for losses, misappropriations and preferences, may set off, against his deposits, liability on his individual debts and notes and on his joint and several notes, but not his liability as surety or endorser, nor as a joint debtor.    (p. 134).

6.    SAME—*Insolvency—Claims—Effect of Assignment.*

It is error to postpone, in a decree of distribution of the assets of an insolvent bank, the assignee of deposit accounts therein, though he is an officer held liable for losses and misappropriations and preferences.    In this respect, such claims should be treated as if they had been his originally, unless there is an equity against them in favor of the bank.    (p. 133).

7.    SAME—*Insolvency—Liability of Officers.*

In the settlement of the affairs of an insolvent bank, its president is properly chargeable with the amounts of worthless notes and overdrafts of corporations, promoted and controlled by him and his associates, discounted by the bank with his knowledge, under his direction and with notice on his part of the financial ability of the makers, inferable from his relation with them and participation in the management and control thereof.    (p. 136).

8.    SAME—*Officers—Resignation.*

An officer of a bank who has sold his stock and tendered his resignation is nevertheless a *de facto* officer, if his resignation has not been accepted nor the vacancy in the office filled and his acts and the surrounding circumstances prove he continued to act for the bank and participate in the management and control of its affairs.    (p. 135).

9.    SAME—*Insolvency—Liability of Officers.*

An officer is liable for withdrawal from an insolvent bank, after knowledge of its insolvency, of deposits made and controlled by him, though he is not sole owner thereof.    (p. 139).

10.    SAME—*Insolvency—Preferences.*

Transformation, by an officer of a failing bank, of its certificates of deposit held by him into a well secured debt held by the bank, by surrender of the certificates in part payment of the debt and taking a new note from the debtor, secured and

payable to himself, constitutes a preference, the benefit of which must be surrendered in the settlement of the affairs of the bank· (p. 140).

11. BILLS AND NOTES—*Certificates of Deposit—Bona Fide Purchasers.*

Certificates of deposit in a bank, fraudulently issued, are valid obligations in the hands of a holder thereof for value without notice of the fraud.   (p. 141).

12. BANKS AND BANKING—*Officers—Liability.*

Officers of a bank, participating in misapproripations and transactions occasioning losses, are jointly and severally liable for such misappropriations and losses, and there may be a separate decree against any of them.   (p. 141).

13. SAME—*Insolvency—Assets—Subscriptions of Stock.*

In the settlement of the affairs of an insolvent bank, the unpaid subscriptions of stockholders constitute a part of the assets and stockholders may be required to restore dividends unlawfully and improperly declared out of ·funds and assets other than profits, and paid in cash or applied in satisfaction of unpaid subscriptions.   (p. 141).

14. SAME—*Insolvency—Liability of Stockholders.*

In a creditor's suit against an insolvent bank, the statutory liability of stockholders for amounts · equal to their subscriptions in addition thereto may be invoked and such amounts brought in for distribution with the assets of the bank.   (p. 141).

15. SAME—*Insolvency—Creditor's Suit.*

In such suit, a transfer of stock, made with intent to avoid the statutory liability and defraud creditors of the bank may be assailed by cross-bill, if it has not been attacked by the plaintiff of the receiver.   (p. 142).

16. APPEAL AND ERROR—*Decisions Reviewable—Provisional Orders and Decrees.*

Provisional orders and decrees. not final in character, but reserving for future adjudication matters in litigation are not appealable.   (p. 144).

Appeal from Circuit Court Marshall County.

Bill in equity by M. L. Benedum against the First Citizens' Bank and others.   From the decree, plaintiff and defendants John A. Howard, special receiver, and August Wendt appeal.

*Reversed in part.   Modified in part.   Affirmed in part.   Remanded.*

*T. S. Riley, J. M. Ritz, George J. Wolf, John S. Weller, John O. Wicks, Wm. M. O. Dawson* and *Malcolm Jackson,* for appellants.

*J. C. Simpson, Caldwell & Caldwell* and *McCamic & Clarke,* for appellees.

POFFENBARGER, PRESIDENT:

The appellant, M. L. Benedum, to whom there was decreed, in this suit brought to wind up the affairs of the First Citizens Bank of Cameron, more than $94,000.00 on account of deposits in his own name and those of other persons by him and interest thereon, and against whom large amounts were decreed, far in excess of the amount allowed him, on account of his liability on certain notes to which he was a party as maker or endorser, overdrafts alleged to have been permitted by him as president and director of the bank, preferences given by withdrawal of deposits and losses occasioned by his negligence and misconduct, was denied the right of set off as to the notes on which he was liable and also participation in the distribution of the assets of the bank, as to all sums decreed to him, until after all other creditors shall have been paid; and he has appealed from the decree.

The bank closed its doors on the 24th day of December, 1903, in pursuance of an order of the board of directors thereof, made on the preceding day. Benedum commenced this suit on the 26th day of December, 1903, and, on that day, secured the appointment of a receiver to take charge of the assets of the bank. The bank itself and most of the stockholders were made parties defendant. In response to notice of the application for the appointment of a receiver, the bank, by its president, Wm. M. Kincaid, filed an answer, admitting substantially all the allegations of the bill. On the first day of March, 1904, J. M. Marsh and numerous other creditors of the bank filed their petition praying to be made defendants which prayer was granted. On the 18th day of June, 1904, George N. Hoffman, G. W. Hazen and W. A. Hazen filed a similar petition the prayer of which was granted, and on the 2d day of July, 1904, these defendants and others filed answers and cross bills in the cause, setting forth numerous grounds for relief against M. L. Benedum, former

president, A. E. Fox, former cashier, Wm. M. Kincaid, president, and all of the directors and stockholders.   These cross bills. charge many gross acts of negligence on the part of Benedum and Fox and violations of law both by them and the stockholders and other directors, among which were two unauthorized dec- larations of dividends, one of which was averred to have been credited on unpaid subscriptions and the other paid in cash. Large losses due to the negligence and misconduct of the di- rectors and stockholders were charged.   It is also alleged that Benedum and Fox, knowing the insolvent condition of the bank, fraudulently disposed of their stock to avoid statutory liability thereon.   Liability of the stockholders under the statute in amounts equal to their respective subscriptions and in addition thereto, as security for creditors, was asserted and the benefit of the statute invoked.   A demurrer to the cross bills, assigning their insufficiency as a whole and the insufficiency of certain parts thereof, was overruled except as to three portions, those charging liability on account of the dividends declared, the fraudulent assignment of stock by Benedum and Fox and the statutory liability of the stockholders in excess of their sub- scriptions.   Thereupon Benedum filed his answer and special reply to the cross bills and put in issue all of the allegations thereof against him.

The propriety of the overruling of the demurrer is challenged upon two principal grounds, the exclusive right in the receiver to take into his possession all of the assets of the corporation and enforce liabilities of the stockholders and others, and the relation of the matters or grounds of relief set up in the cross- bill to the subject matter of the original bill.   The admitted insolvency of the bank wholly changed its character and gave rise to new rights on the part of creditors, depositors and stock- holders.   Its assets immediately became a fund to which all had the right to resort.   In them, they *ipso facto* acquired in- terests.   The liability of the officers constituted a part of the assets of the bank.   Though the relation of trustee and *cestui que trustent* did not previously exist between the officers of the bank and the depositors, the liabilities of the officers as agents or trustees of the corporation were assignable and constituted part of the bank's assets, and in them the creditors had an in-

terest as well as in its other assets. Though they were in the possession of the receiver or he had title to them and could sue for and recover them, his possession was for and on behalf of all the interested parties including the depositors and other creditors. He alone no doubt could have instituted separate actions at law against the derelict or fraudulent officers of the bank, had that course of procedure been adopted, for he had, as successor of the bank, the legal title or right of possession, but this argues nothing against the right of the creditors to assert, in this suit, their equitable claims against such sums as are due from the officers of the bank, on account of losses, misappropriations and preferences, as parts of the fund to which they have a right to resort for satisfaction of their claims, if such liabilities may be enforced in this suit. The assertion of these rights here did not disturb the possession or title of the receiver nor in any way interfere with the exercise of his powers.

Though there are some decisions to the contrary, the better opinion is that such claims and demands are cognizable in a. suit to wind up the business of a bank and distribute its assets. "Those rights of the bank are choses in action, which are equitable assets in the sense that they are rights to recover for breaches of trust. They are assignable, and survive against the personal representative of the deceased officer. * * * * This right of the creditor can never be insisted upon except: when the bank is insolvent, for as long as the bank is able to pay, and does pay, its creditors, no creditor is injured by or can complain of the officer's breach of his duty toward the bank. But the bank being insolvent, two principles come into play:: first, the assets ought to be equally distributed among the creditors; and second, the suit being a creditor's bill, all creditors have a right to come into the action, and must come into the action. This fact being conceded, the necessity for a judgment at law and a return of *"nulla bona"* is dispensed with. Such being the nature of the action, it is quite useless for us to say that without a statute such an action does not lie at law; because no creditor's bill lies at law. But since the right against the officer which the creditor is asserting belongs to the bank, the corporation must be made a party, just as the debtor whose rights are being asserted must be made a party. In the next

place, if the bank has an assignee or a receiver, he must be made a party, because the bank's choses in action belong to him; and since he is the custodian of those rights, if he is a receiver, an officer of the court, no suit ought to be brought unless he has refused to bring a suit and thus renounced his intention of enforcing the obligation on behalf of the bank." Zane on Banks and Banking, sec. 86. As the officers of a bank are virtually its trustees, or, at least, may be treated as such, losses occasioned by their negligence and certainly funds misappropriated are proper charges in the settlement of their accounts. Personal representatives of deceased persons are chargeable with such items. *Pinckard* v. *Woods,* 8 Grat. 140; *Hooper* v. *Hooper,* 32 W. Va. 541; *Anderson* v. *Piercy,* 20 W. Va. 324; *Evans* v. *Shroyer,* 22 W. Va. 581; *Reitz* v. *Bennett,* 6 W. Va. 417; Guardians are chargeable with such items. *Hunter* v. *Lawrence,* 11 Grat. 111; *Truss* v. *Old,* 6 Rand. 556; *Roush* v. *Griffith,* 65 W. Va. 752. Trustees *eo nomine* fall under the same rule. Perry on Trusts, sec. 848. These cross bills are in effect creditors' bills, not mere declarations against the corporate officers for injuries occasioned by their alleged deceit and fraud. Claims of the latter class for unliquidated damages might not be germane to the purpose of the bill, nor provable before the commissioner. These cross bills charge the assets of the bank, including all sums due from its trustees, with debts, not claims for damages.

Though a number of decisions say unwillingness, neglect, failure or refusal of the receiver to sue must be shown by a creditor as a prerequisite to his right of action, many of them are instances in which creditors sought by their suits to withdraw, from the custody of the receiver and the jurisdiction of the court, in particular cases, the assets of the insolvent corporation. That is not the character of these cross bills. They are filed in a cause in which a receiver had been appointed and do not attempt any interference with his possession or custody. While they relieve him of the necessity of suing to get in these assets or filing in this cause the necessary pleading to accomplish that result, they set up no right of withdrawal of any assets or interference therewith. Their sole purpose is to charge the officers and directors of the bank. Treating these claims against the officers as causes of action arising out of breaches of trust

and assets of the corporation to which creditors may resort for satisfaction of their claims, as well as its other assets, the matter of the cross bills was germane to the subject matter of the bill; and, although the creditors might appear before the commissioner and file their claims and have them adjudicated, no reason is perceived why they might not also set up, in this cause, these breaches of trust without any intrusion upon the right of the receiver. Decrees for the amounts due by reason thereof would be in his favor and for the benefit of the creditors. The original bill might properly have contained the allegations of the cross-bills and likely would have done so, had it been filed by a creditor or some person not indebted or liable to the bank on any account; and failure to include them necessitated further allegations of vital matters requisite to bring into the suit all the creditors were entitled to. The cross bills were filed by permission of the court and did not conflict with any proceedings instituted by the receiver. He had not sued to get in these assets.

The decree holds Benedum liable, individually in some instances, and, in others, jointly and severally with Fox and others, on notes amounting, together with their interest, to $32,480.93; on account of losses from the discounting of bad notes, amounting with their interest to $64,709.76; jointly and severally with Fox in two instances, and with Fox and Harkins in one, for overdrafts amounting to $15,311.24; for a preference amounting with interest to $29,200.00, in a transaction relating to a note for $30,000.00, secured by a deed of trust, which he took over to himself partly in exchange for certificates of deposit in the bank; and for withdrawals amounting to $10,144.97. Though required by the decree to restore to the assets of the bank these preferences and losses, all that have been decreed against him so far, he is denied participation in the distribution of the assets until all the other creditors shall have been paid. As authority to sustain this discrimination, *Elliott v. Farmers Bank of Philippi,* 61 W. Va. 641, is relied upon. The court's holding in that case, however, was based upon the special and particular facts disclosed by the record. In the opinion, Judge MILLER said: "The court below, acting on the principles of these authorities, evidently concluded, and we think rightly, that there

had been such gross negligence and inattention to the business of the bank on the part of the directors, before and after insolvency, in relinquishing rights, and in acquiring for themselves unjust advantages over other creditors, as to require that they should be postponed until the claims of all other creditors had been fully satisfied." The conclusion evidently rested upon the assumption of undue advantages obtained, losses occasioned and never made good, misappropriations not restored, and other acts by which the complaining stockholders and officers had profited to the detriment of the general creditors. Here the position is different. The decree deprives Benedum of all preferences, makes good all losses occasioned by the negligence and misconduct of the directors and officers and compels restoration of all misappropriations, so far as ascertained and determined.

The theory of the trial court seems to have been to make available for the depositors, by the postponement, a sort of general liability on the part of the managing officers for undefined and general damages for wrecking the bank by violations of law and other wrongs of omission and commission. This view, however, goes beyond both the pleadings and the evidence and includes a species of liability not germane to the bill or subject matter of the suit. These depositors sue here as creditors of the bank and assert and prosecute the bank's claims and demands against the officers, not their own causes of action for fraud and deceit. For injury occasioned by misrepresentation as to the bank's solvency, inducing deposits and thus causing loss, each depositor would likely have to sue alone and at law. The cause of action would be his, not the bank's, and sole, not joint with other depositors, and the recovery would be his own, not a mere asset of the bank applicable to repayment of his deposit as a debt. Nor is the bank or anybody on its behalf suing for general damages, if such a demand could be asserted by a *cestui que trust* against the trustee, in a court of equity—a very doubtful proposition to say the least. The remedy of *cestui que trustent* against trustees is an accounting in equity. If the property has been lost or misappropriated or sold for inadequate prices or other wrongs done by the trustee, the property loss, not damages for wrongs, is the basis of the accounting. *Norman's*

*Exr.* v. *Cunningham,* 5 Grat. 63, 72; *Oliver* v. *Pritt,* 3 How. (U. S.) 333; *Baker* v. *Whiting,* 3 Sumn. 475; *Freeman* v. *Cook,* 6 Ired. 373; *Bradley* v. *Luce,* 99 Ill. 234; *Trecothic* v. *Austin,* 4 Mason 16, 29; *Johnson* v. *Ames,* 11 Pick. 181. But if the stockholders or creditors could assert, against the officers, a claim for such general damages in a creditor's suit, the data for the assessment thereof would have to be produced in evidence. All losses of every form, gains prevented and loans and debts lost could not be charged up, without reference to the conduct of the officers in the particular instances, because of unlawful acts or misconduct not contributing in any way to the results in such cases. Bad loans may have been made and lost despite the utmost diligence and good faith. Advantageous bargains may have escaped and profits been lost, notwithstanding an honest exercise of judgment and diligent inquiry. Surely a court of equity will not inflict punitive damages or decrees for smart money. We do not construe these cross bills as asserting any such claims, nor see in the evidence data for an assessment of such damages. While the answer charges in general terms the failure of the bank on account of the bad and improvident management of Benedum and Fox, this charge seems to have been intended as the basis of several and personal liability on their part for the specific losses and misappropriations pointed out and complained of. As Benedum is required to make good and restore all these, so far as his liability has been fixed, and other similar claims against him seem to be pending and undetermined, no reason for postponement of his debts to those of other creditors, as regards the assets reported by the receiver, is perceived. The only safe and just course is to ascertain his entire liability and then allow him to participate in the distribution, on payment to the receiver of a sufficient amount to insure ratable distribution of the assets among all the creditors, including himself. Should it become necessary to resort to unpaid subscriptions or amounts recoverable under the statute, the rule applicable to distribution of such assets may be different.

The decree further discriminates against Benedum by postponing him in the distribution of the assets as the owner of the following deposits, appearing upon the books of the bank: Bowman Farm Oil Company $34.50; British Columbia Com-

pany $419.13; Hammet Farm Oil Company $272.55; Ingram Farm Oil Company $136.93; Ingram Farm Oil Company $474.50; and Owens Farm Oil Company $40.75, amounting in the aggregate to $2,107.23. There is no basis for such discrimination. He could justly and fairly purchase these deposits, assuming that he did purchase them wholly or in part. It involved no injustice to other creditors. His assignors could lawfully and justly sell, and he could buy, such interests as they had. Of course he took them subject to any existing equities in favor of the bank.

Denial of the right to set off his deposits against his liability on certain notes is complained of by the appellant. In proper cases, the right of set off is available between an insolvent bank and its depositors. Morse on Banks & Banking, sec. 337; Bolles on Banking, p. 856; Jones on Insolvent & Failing Corp., sec. 552; *Bank* v. *Armstrong,* 146 U. S. 499. Until insolvency occurs, depositors are mere creditors of the bank and this relation is not destroyed by the broader or more intimate one of trustee and *cestui que trust,* resulting from the fact of insolvency. It includes the former but does not extinguish it. A claim of this kind was denied in *Lamb* v. *Pannell,* 28 W. Va. 663; but only because the claims were not mutual. It was an attempt on the part of a surety to set up his liability as such against his individual debt. In another aspect of the case, the claimant was endeavoring to obtain the benefit of a preference, which the law did not allow. Only mutual debts are allowable under the law as sets-off. Liabilities on account of misappropriation or attempted preferences are not within that class, for the obvious reason that a set-off thereof would conflict with legal principles, denying the benefit of misappropriations and unlawful preferences. Nor does the law permit the set-off of a joint liability against an individual one. *Ellott* v. *Bell,* 37 W. Va. 834; *Choen* v. *Guthrie,* 15 W. Va. 100; *Perkins* v. *Hawkins,* 9 Grat. 649; *Porter* v. *McCurvy,* 4 Rand. 369. But joint and several demands may be set off. *Elliott* v. *Bell,* cited. Nor can a surety set off the debt of his principal against his own individual debt, or his individual claim against a debt for which he is liable as surety, except under peculiar circumstances. *Choen* v. *Guthrie,* 15 W. Va. 100; *Edmunds* v. *Harper,* 31 Grat. 637.

This rule denies the right of set off to persons liable as indorsers, because they are sureties. *Bank* v. *Pickens,* 93 Va. 510; Daniel Neg. Instr., secs. 1303-1305.

Under these principles the court properly refused to allow Benedum to set off against his deposits the decree against him and Fox for $14.139.45, on account of a promissory note executed by one Bostock and others to them and endorsed by them; the decree against him for $500.00 on a note executed by him jointly with J. B. Myers and Fannie Myers; the decree for $6.755.55 against him, Fox and Harkins, on account of a joint note, payable to the First Citizens Bank, signed by the Cameron Glass Company, on the face thereof, and by them on its back; and the decree for $3,839.17 against him and Fox on account of a note discounted for the Upshur Glass Company and the proceeds of which were used in the business of the said company, it being a concern largely managed and controlled by Benedum. Substantially this last item was a misappropriation of the bank's funds. But he is entitled to set off against his deposits the decree for $1,500.00 against him and Fox on account of their note made jointly and severally with Edgar H. Bostock, and the decree against him for $100.00 on account of a joint and several note executed by him and J. L. Fisher.

As some of the decrees against the appellant are founded upon official negligence and misconduct as a director and president of the bank, his relation to the institution is a question discussed at great length in the briefs. Having made an alleged sale of his stock to one Englehart on the 26th day of July, 1903, a date prior to some of the transactions complained of, and, having at or about that time tendered his resignation, which the board of directors did not accept, it is urged that, from and after that date, he was not an officer or director of the corporation. Though the severance of his relation as a stockholder rendered him ineligible to the office of director or president, that circumstance is not conclusive, since he could still be liable as a *de facto* officer; and, if thereafter he assumed to act for and on behalf of the corporation and was in fact, though not in name, the president, he was a *de facto* officer. *Hulings* v. *Lumber Co.,* 38 W. Va. 351, 361; Clark & Marshall Corp., sec. 662; Cook

Corp., sec. 623. As has been stated, Benedum's resignation, tendered in July, 1903, was not accepted nor was the vacancy filled until December 23, 1903. If the bank had any president during this interim, Benedum must have been the incumbent of the office. Witnesses say he did exercise the powers of the office and a few instances of official action are shown. On the 12th day of October, 1903, he endorsed the bank's name on a note, designating himself as president. In the same month, he transformed $20,000.00 of certificates of deposit in the bank into a well secured note of J. Fay Watson which the bank had held. On the face of the matter, the bank demanded payment of Watson, who applied to Benedum for a loan which was made, and $20,000.00 of the Watson debt to the bank was paid in its own certificates of deposit, Benedum taking a new note from Watson well secured. This transaction was very much for the benefit of Benedum and to the detriment of the bank. Two days before the bank closed its doors, a $10,000.00 transaction took place between it and stockholders of the Wetzel Window Glass Company, in which Benedum and Fox were considerably interested. He and A. E. Fox were business associates, interested together in the bank and many other enterprises. Both claimed they had disposed of their stock and resigned at the same time. Fox, notwithstanding the tender of his resignation, continued to act as cashier until the bank closed. Both attended the meeting of the directors on the 23rd day of December, 1903, and participated in the proceedings then had, looking to the winding up of the corporation, closing its doors and procuring the appointment of a receiver. Benedum himself says Kincaid was then elected president because there was a doubt as to whether he (Benedum) was president. After the tender of his resignation in July, 1903, much of the bad paper of the business concerns in which he and Fox were interested together was still carried by the bank and Benedum continued to be its largest customer, the bank holding large deposits of his as well as a good deal of his paper. In view of all these circumstances, we are unable to say the court erred in finding he was a *de facto* officer until December 23, 1903.

The decree holds the appellant liable for the amounts of the following notes, to none of which he was a party as maker, en-

dorser or guarantor, on the theory that they were bad debts, negligently and recklessly made and partially for his benefit as the promoter of the enterprises executing them: A Marshall Window Glass Company note for $29,650.00, a note of the same company for $4,500.00, a note of the Upshur Glass Company for $7,500.00 and a note of the Wetzel Glass Company for $3,580.83. Benedum was the promoter and president and Fox the treasurer of the Cameron Glass Company, a part of whose indebtedness to the bank, represented by notes and overdrafts, was converted into a note of its successor, the Marshall Window Glass Company, for $29,650.00. In violation of both the statutory law and the by-laws of the bank, the Cameron Glass Company had been allowed to become largely indebted to the bank. On December 23, 1901, it had an overdraft of $4,628.23 and on March 4, 1902, of $16,982.81. On April 1, 1902, a note for $16,588.45 was given for the Cameron company's overdraft and the form of the indebtedness changed. Thereafter its overdrafts were as follows: Oct. 4, 1902, $17,188.39, April 9, 1903, $22,633.88, July 19, 1903, $21,000.00, Dec. 23, 1903, $6,042.40, increased on the same day to $9,022.12 by the transfer of a fund or overdraft on another account known as the Federation Account. In the meantime, about April 27, 1903, the Cameron company sold and transferred its plant, machinery and everything, except the glass on hand, to a new company known as the Marshall Window Glass Company for $29,650.00, taking its note therefor. At that time, the plant was estimated to be worth only about $30,000.00 and constituted all the property the Marshall Window Glass Company had, so far as the record discloses, and the Cameron Glass Company, having thus sold its plant and being largely indebted, was insolvent, so that its endorsement constituted no security. A deed of trust was taken on the plant to secure the note, but that security was obviously insufficient, and, in the next year, the plant was destroyed by fire so that it wholly failed. At the time of this transformation of the Cameron Glass Company into the Marshall Window Glass Company, the former owed the bank in notes about $34,400.00 and large overdrafts. Besides, there was a heavy overdraft in the Federation Account of the company, for which it was liable, so that its indebtedness to the bank was fifty or sixty thousand

dollars and it owed other debts to other persons. The note for $29,650.00 was substituted for the Cameron company's notes to that extent, leaving a balance of $5,750.00 on account thereof, no settlement for which is shown. Both the Upshur Glass Company and the Wetzel Glass Company were organized by Benedum and Fox. The former seems to have been the older and was largely financed by overdrafts for the purpose in the name of Benedum, agent. Sometime after its organization, Benedum and Fox sold out their interests in it to other persons for $14,-200.00, taking a series of notes therefor, executed by W. H. Howard as agent of the makers, the stockholders of the company. These notes were discounted by the Citizens Bank of Cameron and the proceeds placed to the credit of M. L. Benedum, agent. They were never paid, but in December, 1903, a note of the Wetzel Window Glass Company for $10,000.00 on which there was a balance due of $9,450.00 with some interest was substituted for a part of them. It seems that the proceeds of the Howard, agent, notes discounted by the bank were largely used in the promotion of the Wetzel Window Glass Company. All these enterprises seem to have been mere speculative ventures, having no solid basis, and, of course, Fox and Benedum, the promoters and managers thereof, knew all about their condition and must have known their assets constituted no sufficient security for their large notes discounted and overdrafts permitted in the bank. Whether Benedum can be said to have received the benefit of these sums of money, or is responsible for having made the loans and permitted the overdrafts with knowledge of the insufficiency of the security, the result is the same. If he actually received the benefit thereof, he is bound to make restoration, and, if he knowingly made bad loans or permitted them by his inattention to the business of the bank, he is liable for the losses resulting; and in neither case can he be permitted to set off his deposits against these liabilities, for, in the former, he would obtain a preference, and, in the latter, take the benefit of his own wrong. In view of the facts here stated and others disclosed by the record, we are of the opinion that the circuit court did not err in holding him liable for these notes.

These observations, principles and conclusions apply with

equal force to the overdrafts decreed against Benedum, except in those instances in which the court erred in holding or finding the existence of overdrafts. One of these was for $13,081.07, made by the Cameron Glass Company. Related to it is a decree for $224.20 as interest on the same overdraft. Another is for $135.30 on account of the overdraft of the S. D. Outward Farm Oil Company account. Lastly, there is one of $1,698.89, on account of an overdraft in the name of M. L. Benedum, agent. We perceive no error in any of these. But, in this connection, there is an erroneous charge against him as to a withdrawal of $3,920.59, pertaining to the same account. On December 21, 1903, there was in the bank to the credit of that account $3,139.00, against which checks were drawn on that date amounting to $3,920.59. This created an overdraft of $781.59 which, with the interest thereon and on other overdrafts to December 24, 1903, aggregated $1,171.65. The checks constituted a withdrawal to the extent of the amount of money then in the bank to the credit of that account, $3,139.00, but not $3,920.59, and an overdraft to the extent of the difference between these two sums, $781.59. As this is the amount decreed as an overdraft, together with interest, the error is in the decree for the withdrawal, and the extent thereof $781.59 as of the 21st day of December, 1903.

On account of funds withdrawn from the bank from November 9, 1903, to December 21, 1903. most of them in December, and all after the insolvency of the bank must have been apparent, the court decreed against Benedum sums aggregating $10,144.97 and, with their interest at the date of the decree, to $14,709.18. They were as follows: Benedum and Fox account $550.00; M. L. Benedum, Agent, $3,920.59; Buckhannon account, M. L. Benedum, Agent, $750.00; Benedum Bros. $235.70; C. Y. Benedum, Trustee, $3,000.25; Bowman Oil Co. $715.00; Hammet Oil Co. $217.43; and British Columbia Co. $756.00. As these accounts were under Benedum's control, he is properly chargeable with them in so far as the findings as to amounts are correct. He either got the benefit of them or was the instrumentality of their wrongful withdrawal. The amount charged on account of the withdrawal from the M. L. Benedum Agent account is too large, however. Deducting from the total

the erroneous charge of $781.59 with its interest from December 21, 1903, to June 11, 1911, found to be $352.01, the amount the court should have decreed on account of these withdrawals is ascertained to be $13,575.48, and the decree will be modified accordingly.

The charge on account of the J. Fay Watson transaction is sustained by the evidence. Seeing the failing condition of the bank and holding certificates of deposit therein for large amounts the bank was unable to pay in cash, he took over the Watson secured debt in exchange for $20,000.00 of these certificates and $10,000.00 in cash, and so obtained a preference over the other creditors, inhibited by law. Though the bank may have thus obtained $10,000.00 in cash, it with the other $20,000.00 represented by the certificates was secured to Benedum by the deed of trust he took over from Watson. Against this view as to Bendeum's motive is urged his failure to withdraw his considerable deposits and his continued patronage of the bank. But the bank was no doubt unable to pay his deposits and for some months before its doors were actually closed, he made few additional cash deposits of any consequence to the credit of any of his numerous accounts, and some of them were withdrawn very soon after they had been made.

No error is perceived in the allowance of a five per cent. commission to the attorneys of the cross bill plaintiffs on the general fund, created for the creditors by this suit, to be apportioned and charged against the several creditors in the distribution. But this provision of the decree will be so modified as to make it conform to the decree as here altered respecting the rights of M. L. Benedum. No commission to the attorneys of the cross bill plaintiffs can be allowed on such portion of the fund as shall go to him. The decree in its present form may not give it, but, as a matter of precaution, it will be made clearer by a modification.

The action of the court in refusing to find and hold the notes of W. J. Bryan, amounting to more than $25,000.00, constitute a part of the assets, is complained of; but, as the court merely continued the hearing and consideration of the motion for such a finding and did not finally dispose of it, the assignment is not well taken.

An adjudication of the liability of the bank, in the sum of $7,275.36, including interest, in favor of the Security Savings Company of Columbus, Ohio, on account of two certificates of deposit issued to Englehardt and by him assigned to the company, is the subject matter of one of the assignments of error. The certificates were fraudulently issued, but, as they are negotiable and no knowledge of the fraud, on the part of the holder, is shown, we see no error in the decree as to that item.

There was no error in decreeing separately against Benedum. Two or more trustees participating in a breach of trust incur joint and several liability to the *cestui que trust*. *Barksdale* v. *Finney,* 14 Grat. 338; *Row* v. *Spencer,* 29 Grat. 756; *Miller* v. *Hogan,* 9 Grat. 665.

The cross assignments of error, going to the action of the court in sustaining the demurrer to certain portions of the cross bill and striking them out, are well taken. As to the dividends, they were charged to have been declared and paid, not out of any profits of the bank, but out of the capital stock and to its serious impairment. The trial court seems to have based its action, in sustaining the exceptions to these portions of the cross bills, on the theory of indefiniteness and uncertainity. In our opinion, this theory is untenable. A fact was charged, without the details, which made the declaration and payment of dividends improper and unlawful. Apparently the subsidiary facts were not within the knowledge of the cross bill plaintiffs, as they say, and were within the peculiar knowledge of the officers of the bank, of whom the plaintiff Benedum was one.

The other two cross assignments of error involve the question, whether or not the statutory liability of stockholders for amounts, equal to their subscriptions of stock and in addition thereto, is available in a creditors' suit against an insolvent bank. In some jurisdictions, it is held they are not, because the statute was designed for the protection of creditors and not the bank and does not contemplate the recovery of these additional amounts as part of the assets of the bank. Where the statute is so construed, each creditor must sue separately and individually for the amount of his loss. Though the terms of our statute are very general and indefinite, we are of the opinion that the legislative design was to make this liability a fund to

which creditors may resort collectively for satisfaction of their claims in full or *pro tanto,* as the case may be. The whole spirit of our law is against preferences and inequality in the distribution of the assets of an insolvent person or corporation and collective terms are used in the statute. It says: "The stockholders of every bank   *   *   *   shall be personally liable to the creditors thereof over and above the amount of stock held by them respectively, to an amount equal to their respective shares so held for all liabilities accruing while they are such stockholders." If this fund is intended for the common benefit of the creditors, as we think it is, it is virtually, though not in name, an asset of the bank, for it is distributable along with the other assets. It could not be apportioned and distributed without reference to other assets. Hence it becomes necessary, in the apportionment thereof, to marshal the assets and, for the purpose, bring all the funds together, from which it follows that a fraudulent transfer of stock by a stockholder to avoid this liability to the creditors in general and also the right to invoke the benefit of the statute against all stockholders are germane to a bill to wind up the business of an insolvent bank and distribute its assets. We think, therefore, the court erred in sustaining the exceptions to the portions of the cross bills, relating to fraudulent transfers of their stock by Benedum and Fox and the invocation of the statutory liability of the stockholders.

What has been said on the subject of postponement suffices to sustain the action of the court in refusing to postpone the deposit account of Benedum Brothers.

The finding of the commissioner that the Camden Pottery Company deposit account is held by Sadie U. Benedum as collateral security for a note of that company is challenged, because M. L. Benedum, speaking from recollection in the course of his testimony, said he had bought it. We agree with the trial court that this is not sufficient to overcome the commissioner's finding. Benedum had just said he did not remember what accounts he had purchased. The commissioner goes into details, showing how it is held by another person.

The commissioner charged Benedum with a note of C. S. Harper, upon the statement of the receiver that he had a pencil

memorandum signed by Benedum, in which he had guaranteed, or agreed to pay, the note. Not having it with him, the receiver did not file it as a part of his deposition at the time nor at all. The court sustained an exception to the finding, but did not reserve to the cross bill plaintiffs or the receiver the right to file it hereafter. Since there is evidence of the existence of the paper and consequent probability that the claim can be proved, this right should have been reserved. *Hager* v. *Melton,* 66 W. Va. 62. In other respects, the ruling is correct, and as to this it will be corrected.

In so far as the decree of June 24, 1911, denies to the appellant M. L. Benedum right of participation in the distribution of the assets of the bank, respecting any of the several sums adjudged or decreed to him in any capacity or on any account, until the other creditors of the bank shall have been paid in full, and denies to him the right to set off against his deposits in said bank the $1500.00 note and the $100.00 note, hereinbefore mentioned, it will be reversed, set aside and annulled; and, in so far as it requires said Benedum to pay, on account of withdrawals and interest thereon, the sum of $14,-709.18, and purports to allow the attorneys for the cross bill plaintiffs a commission of five per cent on so much of the fund created in this cause for the benefit of creditors, as is collected or received by the special receiver under it, subject to certain specified exceptions, the same will be modified and corrected so as to require said Benedum to pay, on account of withdrawals and interest thereon, the sum of $13,575.48 and so as not to allow said commission to said attorneys on such portion of said fund, or any part of such portion, as shall be payable to said. Benedum in the distribution thereof. Said decree will be further modified and limited so as to leave open the question of said Benedum's liability on the C. S. Harper note. In all other respects the same will be affirmed.

The decree of the 28th day of April, 1906, is reversed, set aside and annulled in so far as it sustains the demurrer and exceptions to certain portions of the answers and cross bills of Geo. N. Huffman et al, and J. M. Marsh et al, and strikes out the same. In all other respects said decree is affirmed.

### APPEAL OF JOHN A. HOWARD, *Special Receiver.*

The appeal of John A. Howard, Special Receiver, complaining of the disallowance to him of credit in his account, for certain attorney's fees paid out on account of the collection of certain claims, was improvidently awarded and should be dismissed. Deeming the evidence to sustain these claims unsatisfactory and insufficient, the court disallowed them only provisionally, expressly declaring in the decree that none of such matters were finally passed upon.

### APPEAL OF AUGUST WENDT.

A decree entered November 8, 1911, allowed the special receiver $1,000.00 out of the funds in his hands on account of compensation for his services, but reserved for future adjudication the question, whether the receiver's compensation and expenses shall ultimately be decreed against the plaintiff or paid out of the fund. From this decree, August Wendt has appealed. His appeal was improvidently awarded. The decree is not final and does not settle any principle nor change the title or possession of property. It is a mere provisional allowance out of a fund in the custody of the court.

*Reversed in part. Modified in part. Affirmed in part. Remanded.*