Common Pleas Court of Lucas County.

STATE OF OHIO, EX REL IRA J. FULTON, SUPERINTENDENT OF BANKS, V. THE CITY AUTO STAMPING CO.

Decided February 15, 1932.

*Gilbert Bettman,* Attorney General, *William J. Ford,* and *Sigmund Sanger,* for plaintiff.

*William H. Boyd, Erwin R. Effler* and *LeRoy E. Eastman* for defendant.

MARTIN, J.

At the commencement of this trial only cause No. 127850 was assumed to be on hearing, but at the conclusion of all of the evidence it was stipulated that both causes, viz. 127850 and 127851, should be submitted on the record made in the trial.

So that the question as it now stands for determination involves the withdrawal of $400,000 from the Security-Home Trust Co. on the 16th day of June, 1931, by the City Auto Stamping Co. and the City Machine & Tool Co.

Because of the seeming absence of any law directly in point on the real question involved in these cases, viz., the right to compel the restitution of these amounts so withdrawn on the 16th day of June, 1931, it becomes quite important to set forth with much clarity the facts as they were developed from the evidence in the case.

It appears quite definitely that for at least six months prior to the 16th day of June, 1931, the Security-Home Trust Co. was steadily losing ground, and for some 10 days or two weeks prior to the closing of the bank the special sub-committee appointed by the executive committee of the bank was working on some one or more plans looking to a merger with some other bank or some assistance from some source that would give the bank a new lease on life, and that these matters were fully within the knowledge of Mr. Mills the vice-president of the bank and an officer of the defendant company very clearly appears from his own evidence, and it will only be necessary to refer to a small portion of the evidence to demonstrate this fact. Referring to this sub-committee I quote from the record of the examination of Mr. Mills:

"Q. Well, what was the sub-committee appointed for, give us a word which will cover it, what was it for?

A. As I understand it they were appointed for the purpose of working out the so-called merger with Mr. Thompson.

Q. Was the bank in need of assistance? A. What do you mean by assistance?

Q. Help, money? A. Well then I will answer no.

Q. Then what did you have the sub-committee working on? A. Working toward a merger to take it over.

Q. Well, why did you work upon a merger to take it over? A. Why, the general trend of affairs.

Q. What was the trend of affairs? A. Well, the depreciation of values, real estate values, reserve values, lack of deposits, withdrawal of deposits, the general business conditions tended to be downward.

Q. Then didn't that mean that the bank was in need of assistance? A. Not necessarily.

Q. Well, what endeavors did you make to do something in view of that trend of affairs? A. We appointed a sub-committee to meet Mr. Thompson and try to work out a merger.

Q. What would that do for the bank? A. That would help the community.

Q. Well, would it do anything for the bank? A. Well, it would give the bank a new lease on life.

Q. Now was anything besides that being done to give this new lease on life—at last we have got a word that you have used—anything besides this attempted merger? A. Well, we were endeavoring all the time to get new business, we never relaxed a moment.

Q. Were you attempting to stop withdrawals? A. Yes, sir.

Q. But if the doors were closed against the proposed merger was there anything else, any other plan, to get this new lease on life that you or your sub-committee was working on? A. Not to my knowledge."

Still other matters of special importance in relation to the bank's condition came to the attention of Mr. Mills during the 16th day of June, the last day that the bank remained open. According to his own testimony he was present at the meeting of the board of directors at 8:30 that morning and also the meeting of the executive committee immediately following, and knew everything which took place at both meetings.

Ira J. Fulton, superintendent of banks, was also present both at the meeting of the board and of the executive committee, and his statement as to what occurred at the meeting of the board of directors and the meeting of the executive committee immediately following is not challenged in any particular. I quote briefly from his testimony with reference to that early morning meeting of the board:

"—we simply told the board that it seemed imperative that something be given in the way of assistance to the bank and we had no right to go to any other bank in regard to the affairs without permission of their board, suggesting at the same time that this matter be given over to their executive committee for final action.

"My recollection is that is about the only matter we took up in the bank at their meeting in the morning, and they turned it over then to their executive committee. The executive committee in turn appointed as another committee three to go with us during the day and see what we could work out. After working with the other banks we called a meeting of the Clearing House association late in the afternoon of Tuesday and seemed to be unable to get any help at all for the affairs of the Security bank, and then it was decided at a later meeting of the board that evening when they voted to have the department of banks take over their bank for liquidation."

Again quoting from Mr. Fulton's testimony:

"I think from our conversation with both committees they had a feeling, and we had after talking to them, they had exhausted about every resource that they could do for themselves and they had already reached the point where it required some outside assistance, and unless that could be obtained we didn't see how they could help themselves enough to carry on."

It also appears from Mr. Mills' own testimony that he had a fairly accurate knowledge of the happenings that were taking place in the bank on that 16th day of June, as will be evidenced by a quotation from his testimony in that regard:

"Q. What made you so busy that day? A. Well, we were always busy around the 15th of every month, and the 16th—pay day.

Q. I don't think you answered my last question as to how the withdrawals on that day, the 16th of June, compared with the deposits? A. I don't know.

The Court: Did you know at the time on that day, for instance, when there were so many people in and about the bank—did you know at that time whether or not the withdrawals exceeded the deposits? A. Yes, sir, that was the information given to me, your honor.

Q. In other words, you knew upon the 16th of June that more money was going out than was coming in? A. Yes sir.

Q. Mr. Mills, you say that you were contact man of the bank. You knew on this day of this early meeting of directors that there was heavy withdrawals that day, did you not? A. I did during the day, yes, sir.

Q. And, of course, you knew there had been heavy withdrawals, or a gradual shrinking of deposits, for a period of five or six months before June 16th? A. Yes, sir."

It appears also from the evidence that during the entire day of the 16th until after the close of banking hours on that day that Mr. Fulton, superintendent of banks; President McNary, Mr. Eastman and Mr. Kuhlman, the special sub-committee, were working continuously with Mr. Henry Thompson of the Toledo Trust Co., Mr. George M. Jones of the Ohio bank and others, looking to the procurement of some aid of some sort for the Security-Home Trust Co., and that President McNary only learned of the run on his bank when he came to the bank after 3 o'clock in the afternoon on the 16th day of June.

It is also in evidence, and not disputed, that officers and directors of the bank on that last day withdrew either for themselves or for associations with which they were connected some $688,000 outside of what may have been withdrawn by employes of the bank.

I only cite this as a part of the atmosphere of the day; Mr. Mills having been in the bank by his own admission practically the entire day except during such period of time as he was making visits to the Ohio bank.

These withdrawals sought to be recovered in these suits were in three amounts, one of $300,000 and two of $50,000 each; the two smaller withdrawals having been made sometime around the noon hour and the $300,-000 withdrawal at about the bank's closing hour. Mr. Mills also admitted in his testimony that these withdrawals were made by him personally and deposited in the Ohio Savings Bank & Trust Co.

It also appears from the testimony that the methods employed for transferring the $400,000 from the Security-Home Trust Co. to the Ohio bank were not just the common ordinary methods. By reason of wires on June 16th there was transferred to the Ohio Savings Bank & Trust Co. to the account of the Security-Home Trust Co. from banks in New York, Detroit, Chicago and Cleveland $425,-

000, and the drafts which are the subject matter of these suits, viz., the two $50,000 drafts and the $300,000 draft, were drawn on the Ohio Savings Bank & Trust Co. and, therefore, paid out of the amount so transferred by wire as indicated above.

By this method the amounts of these three drafts were at once transferred from the account of the City Auto Stamping Co. and the City Machine & Tool Co. in the Security-Home Trust Co. to the accounts of those same companies in the Ohio Savings Bank & Trust Co. Any other method would have failed to have effected an immediate transfer of these moneys; nor would any other method have effected a transfer of these moneys at all in view of the fact that the Security-Home Trust Co. did not open on June 17th.

These outstanding undisputed facts are cited because they are necessary to an appreciation and an understanding of the law, which to my mind is controlling in these cases.

If it be necessary in the course of this decision to refer to any other items of evidence, it will be done in connection with the citation of cases bearing upon the questions involved.

In the first place let me say, and quite frankly, that I cannot see that Sections 11104 and 11105 of the General Code have any application to this case; in fact, the right of plaintiff to recover rests not upon statutory law but upon the broad principles of public policy long recognized by the common law as the real basis for all law; in other words, those principles of justice and equity which must guide both the legislature and the courts in their determination of the law.

The laws of real consequence today are those which have come down through the ages and have stood the test of time. The principles of public policy, good conscience and fair dealing are no different today than in ages past, nor do they need statutory enactment to give them force. The sermon on the mount is just as potent today as it was 2,000 years ago, and one's duty to one's fellow man is the same today as it was then.

It is not necessary in the opinion of the court to definitely prove as part of the plaintiff's case that the Security-Home Trust Co. was, on the 16th day of June, insolvent; yet the testimony clearly shows not only its insolvency on that date, but knowledge on the part of Mills of such condition. As an active officer of the institution and one of the four men interested in the active management of its affairs, it was his business to have full knowledge of its condition, and he was charged by law with such knowledge, and, of course, may not be heard to disclaim this knowledge.

That he believed the bank to be in a failing condition is a natural and reasonable inference from his conduct, and that it failed to open its doors on the 17th day of June is merely confirmation of his demonstrated belief.

It is not intended in this opinion to suggest that Mr. Mills' conduct in withdrawing this money from the bank on that last day was criminally wrong, nor to suggest that he was not doing what he thought was proper and right; nor that others might not have done the same thing. But it is the purpose of this opinion to hold that the thing he did was contrary to public policy, equitable dealing and good conscience, and the effect of his conduct was to work a fraud upon the stockholders and depositors of the bank; in other words, that his acts were constructively fraudulent.

It was said in a Georgia case:

"Constructive fraud consists in any act of omission or commission contrary to legal or equitable duty, trust, or confidence, which is justly reposed, which is contrary to good conscience, and operates to the injury of another." And: (156 Ill., page 144) "By constructive frauds are meant such acts or contracts as, though not originating in any actual evil design or contrivance to perpetrate a positive fraud or injury upon other persons, are yet, by their tendency, to deceive or mislead other persons, or to violate private or public confidence, or to impair or injure the public interest, deemed equally reprehensible with positive fraud, and are therefore prohibited by law as within the same reason and mischief as acts and contracts done *malo animo*." Also: (19 N. Y. Supp., page 854) "Constructive

fraud exists where some settled rule of public policy is violated." Also (21 Utah, page 424) "A breach of duty by a person acting in a fiduciary capacity is constructive fraud."

It is quite natural to conclude, therefore, that constructive fraud may undoubtedly arise where the confidential or fiduciary relation is such that the act omitted or committed is contrary to good conscience and produces injury to those who have a right to expect that the conduct of those who stand in that fiduciary or confidential relation will be above reproach and not contrary to public policy, sound morals and good conscience.

The fact that the moneys withdrawn through the medium of those checks and drafts were withdrawn for the City Auto Stamping Co. and the City Machine & Tool Co. does not change the character of the transaction. The officers of the companies effecting the withdrawals were also the officers of the bank, and whatever knowledge was obtained by these officers in the course of their employment was chargeable to and binding upon their principals.

It was said in *First National Bank of New Bremen* v. *Burns et al.*, 88 Ohio St., page 434:

"A corporation can act only through its officers and agents, and the knowledge of such officers and agents in the transaction of the corporation's business within the scope of their authority becomes at once the knowledge of the corporation without any actual or presumptive communication from agents to principal."

It might be well to note the decisions of some of the courts of the country upon some of the questions involved in these cases.

This general rule is laid down in 7 Corpus Juris at page 728:

"Where an insolvent bank transfers property or pays money to a particular creditor, with intent to give him a preference over other creditors entitled to share ratably with him in the assets of the bank, such preference is voidable and may be recovered back, provided the person receiving such preference knew of the bank's insolvency and of the intent to prefer him."

In the case of *McGregor* v. *Battle*, 128 Ga., 577, it was held:

"If a bank, though insolvent, is still conducting its business and pays a check of a depositor in the usual course of business, and the depositor has no notice of the insolvency of the bank, the payment is good and the depositor will be protected. If, however, the depositor is paid, not in the usual course of business, but at a time when he has notice or knowledge that the bank is insolvent, and that the intent of the bank is to create a preference in his favor over other creditors, the payment is not good, and such depositor is liable to repay to the bank, or its representative, such an amount as would be the difference between the amount received by him and his *pro rata* share of the assets of the bank upon a final winding up of its affairs."

The court, in its opinion in this case, said:

"But when a depositor with notice, or knowledge, or reason to suspect that a bank is insolvent, by collusion with the officers of a bank, receives payment of his check not in the usual course of business, and under such circumstances that payment to him gives him a preference over the other creditors, the depositor is guilty of a fraud upon the other creditors, and he will be required to refund all of the amount so withdrawn by him, except what would be his proportion of the assets upon the winding up of the affairs of the bank."

In the case of *James Clark Co.* v. *Colton*, 91 Md., 195, 49 L. R. A., 698, the court held as indicated by the syllabus or head-note in the report of the case, as follows:

"When the affairs of a corporation become embarrassed to such an extent that it is evident that it cannot continue to conduct business and will be unable to pay all of its debts in full, the directors of the corporation are to be treated as trustees for all the creditors, and cannot lawfully pay their own claims, although the corporation may not have been adjudged insolvent or have yet failed to pay any of its debts in the due course of business. The invalidity of such preferences does not depend upon the provisions of the insolvent law, but results from the unfair character of the transaction and its violation of the equitable principle that all the creditors of an insolvent should be treated with equality."

In the case of *Lamb* v. *Ulrich*, 94 Okla., 240, 221 Pac., 741, it was held:

"Where a day before a bank is suspended, its cashier delivered securities to a depositor, taking his check therefor when the depositor and the cashier knew of the serious financial condition of the bank, a finding that the transaction was entered into in contemplation of insolvency and with intent to prefer the depositor over other creditors of the bank was justified."

Counsel for the defendant refer to and quote quite freely from the United States Supreme Court decision in *McDonald, Receiver,* v. *Chemical National Bank,* 174 U. S., 610, which was a case in which there was an attempt by the receiver of a closed bank in Nebraska to recover from the Chemical National Bank certain moneys received by it about the time of the suspension of the Nebraska bank, based upon a federal act which forbade payment after the commission of an act of insolvency or in contemplation thereof if made with a view to the preference of one creditor over another.

It is to be noted, however, in that case that while the U. S. Supreme Court held that these payments and remittances were not made in contemplation of insolvency, or with a view to prefer the Chemical National bank, still it is apparent that the court so held on the theory that the payment that was made to the Chemical National bank was made in the due course of business and in the usual manner; as was undoubtedly true of many transactions out of the Security-Home Trust Co., on the 16th day of June, 1931.

A reading of the case will clearly indicate that the condition which existed in that instance bears no relation in character to the conditions under which the payments were made which are complained of in the cases under consideration here. In no particular, considering the decisions of all of the courts of the country, can the payments complained of here be said to have been made in the ordinary course of business.

The real question involved in this case, however, finds its lodgment in the marked distinction that exists between

ordinary private corporations and banking institutions. The limitations upon ordinary corporations in the transaction of their business, provided they keep within the purposes for which they were created, are few. Not so with banks, however.

And the distinction between banks and other corporations is quite marked when one notes the character of the legislation affecting banks and their operation. This distinction is recognized in practically every state in the union, as well as in the provisions of the Federal act, and this distinction is based upon two outstanding facts: First, practically all of the business of the country is done through the banks; second, banks are operated largely upon moneys that belong to depositors.

If a private corporation has $20,000,000 of assets the chances are, if it is in healthy condition, it will in all probability be the actual owner of 90 per cent. of the assets of the corporation. If it be a bank of an equal amount of assets, the actual ownership of probably 75 per cent. of its assets, and even more, may rest in the depositors of the bank. This is so generally true that legislatures in various states have recognized the fact and have legislated accordingly, and many states have provided for a stockholders' double liability, and most states have placed fairly strict limitations upon the investments allowed the bank; and I might say in passing that these limitations—and I have the word of many bankers for the statement—might well be made much more strict.

In addition to this, most, if not all, states have a state banking department, the law requiring examinations from time to time of banks chartered under the state law. Many of the states have laws holding the officers of the bank to a very strict accountability in connection with the performance of their duties, designating certain conduct of bank officials as violations of the criminal code.

All of these provisions of the law undoubtedly are in recognition of the distinction that exists between ordinary private corporations and banks. So that necessarily the duty owing to a bank by one of its officers is

paramount to the duty he may owe an ordinary private corporation of which he may be an officer. In other words, it must necessarily be true that if an active officer of a bank is also an active officer of a non-banking private corporation, and a conflict of duty arises, his paramount duty is to the bank.

This situation has so seldom arisen that it is hardly safe to say that such is the settled policy of the law, but it must be so held when such a situation as appears in these cases presents itself, else the millions of depositors throughout the country will be without the protection to which they are justly entitled. Whenever this question has arisen, or even been hinted at, the courts have indicated a marked tendency to give special protection to bank depositors.

It was held in the case of *Benedun* v. *First Citizens' Bank*, 72 W. Va., Page 124, that an officer of the bank was liable for the withdrawals from an insolvent bank of deposits made and controlled by him even tho he was not the sole owner of such deposits.

In the case of *Baird, receiver,* v. *First National Bank*, 55 N. D., 856, 56 A. L. R. 200, the court in its opinion said:

"The capital stock of a bank, said Mr. Justice Story, in *Wood* v. *Dummer*, 3 *Mason*, 309, Fed. Cas. No. 17944, was a pledge or trust fund for the payment of debts contracted by the bank, and this was a principle, as he observed, plain in law, as well as in common sense, and creditors might follow that trust fund in the hands of persons having notices of the trust attached to it.

Whatever warrant there may be in the law for invoking a trust doctrine in determining the rights of creditors in the assets of a bank as distinguished from other corporations, it is certain that the plight of the unsecured creditors of a financial corporation makes a much stronger appeal for the application of such a doctrine than exists in the case of creditors of corporations in general. Indeed, the leading case establishing the trust fund doctrine was one in which creditors sought to have set aside a prejudicial disposition of the assets of a bank. *Wood* v. *Dummer*, 3 *Mason*, 308 Fed. Cas. No. 17944. In that case Judge Story said: 'It appears to me very clear upon general principles, as well as the legislative intention,

that the capital stock of banks is to be deemed a pledge or trust fund for the payment of the debts contracted by the bank. The public, as well as the legislature, have always supposed this to be a fund appropriated for such purpose."

This matter is discussed to some considerable extent in the case of *Leach, Superintendent of Banking,* v. *Beazley,* 201 Iowa, 337, a case which is cited by both plaintiff and defendants in their briefs. This is a case in which the superintendent of banking sought to recover money that had been withdrawn from the bank. He was permitted to prevail in his suit against Beazley, who was the president of the bank and who had withdrawn his personal funds, but failed to recover against Miller, who withdrew money belonging to an estate of which he was executor.

To my mind, the case supports clearly the contention which I have made with reference to the duty owing by an officer of the bank. The reason offered for the failure to recover from Miller was simply because the duty which he owed as an officer of the court as executor of the estate was greater than the duty which he owed the bank.

There must necessarily be comparative degrees of trust, and undoubtedly one who is handling other peoples' money is held to a higher degree of accountability than one who is handling his own money, or the money of the company with which he is associated or of which he is an officer. Otherwise, it would be quite necessary for the legislature to provide against banking officials having any other corporate official activities. There must have been some purpose on the part of the Congress of the United States when they provided that the Secretary of the Treasury should not have any interest in any financial institution.

To get back to the *Iowa* case, it would seem quite proper to quote freely from the case. It was held therein:

"That a president or director of an insolvent banking corporation would not be permitted to surrender his personal deposits in the bank and to take the good assets of the bank in payment therefor."

"The relation existing between a banking corporation and the general public is wholly different from that of the relation between the general public and a private corporation. We have recognized the thought that banks are affected with a public interest by the legislature's establishment of a state banking department, under whose supervision these banking institutions are established, controlled and conducted, and, in cases of insolvency, liquidated. This we have not done with any private corporations. Hence, to our minds, many of the rules governing private corporations have no application to banks. To approve this method of withdrawal of deposits by the officers of a failing bank, to our minds, would be wholly inequitable. Once we approve such rule, then, in every instance where a bank is insolvent or in failing condition, every officer and director, and possibly stockholder, knowing of the impending crisis could withdraw his deposits, and thus prefer himself, to the disadvantage of the ordinary depositor. That this is not permissible is settled by the authorities. In the case of *Benedum* v. *First Citizens' Bank,* 72 W. Va., 124 (78 S. E. 656), it is held that an officer is liable for withdrawal from an insolvent bank, after knowledge of its insolvency, of deposits made and controlled by him, though he is not the sole owner thereof. Transformation by an officer of a failing bank of its certificates of deposit held by him into a well-secured debt held by the bank, by surrender of the certificates in part payment of the debt and by taking a new note from the debtor, secured and payable to himself, constitutes a preference, the benefit of which must be surrendered in the settlement of the affairs of the bank."

As indicated above, the court in the same case held that as to the claim of the receiver against Miller an entirely different situation existed. In that particular, among other things, the court said this:

"It is to be remembered that, in his official capacity as executor, he was an officer of the court, and the funds with which he was dealing were not his personal funds, and by withdrawing the same he derived no personal benefit, but thereby husbanded his trust estate. Herein, to our minds, lies the difference between his situation and that of J. M. Beazley. What Beazley did was for his own personal benefit and gain, and, in effect, was a legal fraud, as against the other depositors in the bank.

Not so, however, with Miller, as he personally profited nothing by reason of the withdrawal of these funds. We are, therefore, of the notion that, although Miller may have known of the insolvent condition of the bank, yet, the funds in his hands being a trust fund, it was incumbent upon him, as trustee thereof, to protect the same. By so doing he only performed his duty to his trust; and under such circumstances, he cannot be called upon to return the property to the bank or its receiver. We are, therefore of the opinion that the receiver has a cause of action herein against the appellee Beazley, but that he has no cause of action against the appellee Miller."

Under the theory that this court has of the situation, I cannot accept the view of the New York court as applying in this case. I have reference to the case of *O'Brien, et al, receivers of Madison Square Bank, Respondents,* v. *East River Bridge Co.,* appellant, 161 N. Y. 539, referred to by the defendants. It is not on all fours with the cases under consideration, and differs in many particulars in point of fact from these cases. It is a four to three decision of the court, but there being no dissenting opinion it is somewhat difficult to determine upon what theory three of the judges dissented.

I frankly concede that to some extent it tends to support the claim of the defendants here, but in view of the facts as they exist in the cases under consideration, the marked distinction between banking corporations and other private corporations, the generally accepted duty of an active officer of the bank toward its stockholders and depositors generally, I am strongly of the view that a bank official acting as executive officer of the bank may not be permitted, where a bank is insolvent or in failing condition, to either withdraw his own deposits, or any deposit in which he may have an interest, and thus give preference either to himself or to the company in which he is interested, to the disadvantage of the ordinary depositor; nor may the corporations whose funds are so withdrawn claim such preference. To permit such a course of action would be wholly against public policy, equity and good conscience.

A decree will therefore be entered for the plaintiff in both cases.